117 Cal.App.2d 379 (1953)
In re ARTHUR JOST for Naturalization. ARTHUR JOST, Appellant,
v.
UNITED STATES DEPARTMENT OF LABOR, NATURALIZATION SERVICE, Respondent.
Civ. No. 4400. 
California Court of Appeals. Fourth Dist. 
Apr. 20, 1953.
 Wirin, Rissman & Okrand, A. L. Wirin and Fred Okrand for Appellant.
 Richard W. Petherbridge, Randles & Randles, and Anthony V. Randles, Amici Curiae on behalf of Appellant.
 Walter Binns, United States Attorney, Clyde C. Downing, Assistant United States Attorney, Chief Civil Division, and Robert K. Grean, Assistant United States Attorney, for Respondent.
 William A. White, Malcolm Champlin, B. W. Gearhart, Alfred P. Chamie and Howard R. Harris, Amici Curiae on behalf of Respondent.
 GRIFFIN, J.
 On May 25, 1950, appellant, a native of Canada, petitioned for naturalization. The law then in effect (Nationality Act of 1940, 54 Stats. 1137, 1157 [8 U.S.C.A. 735], as amended by Internal Security Act of 1950, 64 Stats. 987, 1017, U.S. Code [1946 ed.] Sup. IV 735), provided for two oaths, one of which must be taken for admittance to citizenship. The first, (b) (1), so far as here involved, contains the clause that petitioner will "support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I will bear arms on behalf of the United States or perform noncombatant service in the Armed Forces of the United States when required by law. ..." The other (b) (2) omits the provisions in reference to bearing arms or performing noncombatant services in the armed forces. The section then provides that all such applicants for naturalization shall be required to take the oath described in subsection (b)(1) "unless by clear and convincing evidence he can show to the satisfaction of the naturalization court that he is opposed to the bearing of arms or the performance of noncombatant service in the Armed Forces *381 of the United States by reason of religious training and belief."
 The legislative history pertaining to the amendment of this section is set forth in the remarks of Senator Pat McCarran (96 Congressional Record 14183, September 5, 1950, in which he said that by adopting the amendment "we will be adhering to the time-honored practice and procedure of recognizing the bona fide religious convictions of a petitioner for naturalization while at the same time making no exception for those aliens who desire the benefits of United States citizenship but who would shirk its responsibilities."
 Appellant's position is that he is a conscientious objector to war and to service in the armed forces, both as to combatant and noncombatant service; that he is willing and desires to take the oath prescribed in section 735 (b)(2) of 8 U.S.C.A., that he is unable, because of conscientious scruples, to take the oath set forth in subsection (b)(1), which requires a promise to bear arms or to perform noncombatant service in the armed forces of the United States; that he believes his position is in accordance with the teachings of his church on nonresistance; that he produced sufficient evidence to establish this fact and that the trial court abused its discretion in holding that petitioner had not met this burden, citing such cases as United States v. Everngam, 102 F.Supp. 128; Atherton v. United States, 176 F.2d 835; and United States ex rel. Phillips v. Downer, 135 F.2d 521.
 It is not clear from the findings of the trial judge whether he also found that petitioner was "not attached to the principles of the Constitution." He recites in his memorandum opinion and order that "This court has very serious doubts as to whether or not the petitioner is, in fact, attached to the principles of the Constitution of these United States," citing United States v. Schwimmer, 279 U.S. 644 [49 S.Ct. 448, 73 L.Ed. 889]. He then finds that "This court certainly is not satisfied that petitioner's religious faith prevents him from service in the Armed Forces as a noncombatant: ... that the petitioner has not proved by clear and convincing evidence to the satisfaction of this court that he is opposed to the performance of noncombatant service in the Armed Forces of the United States, by reason of religious training and belief."
 The appeal is from the order dated January 4, 1952, denying appellant's petition for naturalization. Certain amici curiae briefs were allowed to be filed on appellant's behalf and on behalf of the government. *382
 It is appellant's first claim that the court erred in holding that he was not attached to the principles of the Constitution because the court's finding was predicated upon the ruling in the Schwimmer case, supra; United States v. Macintosh, 283 U.S. 605 [51 S.Ct. 570, 75 L.Ed. 1302], and United States v. Bland, 283 U.S. 636 [51 S.Ct. 569, 75 L.Ed 1319]; which cases were overruled in the late cases of Girouard v. United States, 328 U.S. 61, 69 [66 S.Ct. 826, 90 L.Ed. 1084]; and Cohnstaedt v. Immigration & Naturalization Service, 339 U.S. 901 [70 S.Ct. 516, 94 L.Ed. 1331].
 If the reason for so finding was that petitioner refused to bear arms and such refusal was based upon his bona fide religious training and belief, then there is merit to appellant's argument. In the Girouard case it was said that in the absence of unequivocal language to the contrary, the court could not assume that Congress intended to make a promise to bear arms a prerequisite to naturalization, and where the oath of allegiance prescribed by Congress for aliens seeking naturalization was that they would support and defend the Constitution and laws of the United States against all enemies, denial of citizenship to one who from religious scruples declared that he would not take up arms in defense of the United States was error.
 [1a] A closer question presents itself as to whether appellant met the burden cast upon him of showing "by clear and convincing evidence ... to the satisfaction of the naturalizing court" that he is opposed to the bearing of arms or the performance of noncombatant service in the armed forces of the United States by reason of religious training and belief and not for some other reason.
 By amendment of June 27, 1952, C 477, title III, chap. 2, section 337, 66 Stats. 258 [ 1448, U.S.C.A., title 8, 1952 Appendix p. 294], adopted subsequent to the entry of the order in the instant proceeding, Congress defined the term "Religious Training and Belief" as meaning "an individual's belief in relation to a Supreme Being involving duties superior to those arising from any human relation, but does not include essentially political, sociological or philosophical views or a merely personal moral code." (See Berman v. United States 156 F.2d 377.)
 In In re Bogunovic, 18 Cal.2d 160 [114 P.2d 581], our Supreme Court held, at page 164, that "The opportunity to become a citizen of the United States is a privilege as distinguished from a right, and the burden is upon the alien to *383 establish the facts necessary to support his application ... that in passing upon the application the court performs a judicial function. It exercises a legal as distinguished from a personal discretion." (Citing cases.)
 In 3 Corpus Juris Secundum, page 833, section 122, it is said:
 "The opportunity of an alien to become a citizen of the United States by naturalization is a mere matter of grace, favor or privilege extended to him by Congress; he does not have a natural, inherent, existing, or vested right to be admitted to citizenship. The only right which an alien has to become a citizen is that which is conferred on him by statute, and to acquire the right he must strictly comply with all of the statutory conditions and requirements. Prior to the filing of a petition in compliance with existing law and a final hearing thereon, an alien has no vested right to citizenship or any right which is not subject to the power of Congress to modify: but the privilege of naturalization ripens into a right when he complies with the conditions prescribed by Congress and establishes the requisite facts." (Italics ours.)
 "... In view of the Constitutional requirement that the rules of naturalization shall be uniform, naturalization laws should be construed and enforced with uniformity. They should be rigidly enforced and strictly construed in favor of the government and against applicant for citizenship." (Citing cases.)
 The phrase "clear and convincing evidence" has been defined as "clear, explicit and unequivocal," "so clear as to leave no substantial doubt," and "sufficiently strong to command the unhesitating assent of every reasonable mind." (Sheehan v. Sullivan, 126 Cal 189, 193 [58 P. 543].) The phrase "to the satisfaction of the court" has been interpreted as meaning "the quieting of the mind of the judge ... the freedom to act according to one's judgment." (State of South Dakota v. Chapman, 1 S.D. 414 [47 N.W. 411, 10 L.R.A. 432]; Lawrence v. Goodwill, 44 Cal.App. 440, 452 [186 P. 781].)
 [2] While it is true a wide discretion is vested in the court, it is beyond the power of the court to exercise this discretion arbitrarily, but when, on a fair consideration of the evidence adduced, doubt remains in the mind of the court as to any essential matter of fact, the United States is entitled to the benefit of the doubt and the application should be denied. (3 C.J.S. p. 851, 140, and cases cited.) *384
 We will therefore consider the evidence presented in the light of these rules to determine if the appellant has met the burden cast upon him.
 Appellant's testimony, summarized, is that he was born in Canada in 1918; that he came to the United States in 1927, has lived here ever since with his wife and children; that he is the West Coast Administrator of the Mennonite Central Committee, director of that faith's mental hospital, and has been a member of the Mennonite Brethren since 1932; that during World War Two he was classified under section 5(g) Selective Training and Service Act of 1940 (54 Stats. 885, 889, 50 U.S.C.A. Appendix 305(g),) as a conscientious objector to service in the armed forces of the United States, but served in the civilian public service camp system working in forestry camps and in mental hospitals that he is willing to render medical service during any war as a civilian, including service on the battlefield itself and to do other civilian work beneficial to the suffering members of society, but that he will not render such services under the direction of the armed forces; that he would not work in a "war plant," buy defense bonds, or do anything directly connected with the war effort; that if called by the selective service system he would serve the United States in a way compatible with his Christian principles of nonresistance; that he would not shoot or kill another human being even in defense of his life or the lives of his family; that he is not willing to serve in the armed forces in either a combatant or noncombatant capacity; that he was brought up in a home where war or participation in war in any form was considered wrong; and that he is willing as a civilian to accompany the armed forces and render first aid or medical treatment anywhere necessary. However, he stated he would not be willing to join the armed forces in any capacity or wear a uniform. He recites that the Mennonite Church was founded during the Reformation times in Switzerland (1525) and Holland (1533) and that it is the Mennonite belief that, as followers of Jesus Christ, they must renounce the use of force and violence in the settling of problems, and that this principle is derived from the Scripture. Reference is made to many passages from the Bible in support of this claimed belief. Received in evidence in support thereof was the "Hand Book of the Mennonite Central Committee, 1950," reciting in part.
 "We can have no part in carnal warfare or conflict between nations, nor in strife between classes, groups or individuals. *385 We believe that this means that we cannot bear arms personally nor directly aid those who do so, and that, as a consequence, we cannot accept service under the military arm of the government, whether it is combatant or noncombatant, which ultimately causes us to be responsible for the destruction of life, health, and property of our fellow men. This applies to all wars whether they be designated defensive or offensive."
 Also received in evidence was the publication "The Principle of Nonresistance as Held by the Mennonite Church," by John Horsch, and "Year Book of the 44th General Conference of the Mennonite Church of North America."
 Appellant relies principally upon Cohnstaedt v. Immigration & Naturalization Service, factually reported in 167 Kan. 451 [207 P.2d 425], wherein the trial court refused an application for citizenship predicated upon somewhat similar facts. The Supreme Court of Kansas sustained the trial court. On a writ of certiorari the United States Supreme Court, in a memorandum opinion, supra, reversed the order, based upon the decision in Girouard v. United States, 328 U.S. 61 [66 S.Ct. 826, 90 L.Ed. 1084]. It appears from the facts and contentions presented in that case that petitioner contended that he submitted sufficient evidence to the trial court to show that he was "attached to the principles of the United States Constitution" and that the court, in 1948, prior to the 1950 amendment here under consideration, found otherwise. The question here presented arises from the finding that appellant failed to establish by clear and convincing proof that he is opposed to the bearing of arms or the engaging in noncombatant service in the armed forces by reason of his bona fide religious training and belief. The two cases may be thus distinguished.
 [1b] The report of the investigation of appellant, conducted by the naturalization examiner, was received in evidence after appellant read it and consented to its admission. It recites that investigation was made to determine whether the religious sect of the Mennonite Brethren Church to which appellant belongs, trains or teaches its members to refrain from performing military service. He sets forth interviews he had with ministers of that church who definitely state that there is nothing in the Mennonite creed or teaching to prevent one from wearing the uniform of the armed forces, and that the Mennonites, as an organization, do not teach their *386 members that they should refrain from performing noncombatant service in the armed forces; that the instructions to the eligible members were that they should register for noncombatant duty. One minister testified that as a minister of that church, he was naturalized in 1948; that he was willing to perform noncombatant service in the armed forces of this country if called upon to do so. Another stated that never in his training had he been told or instructed that he should not perform service in the armed forces. It was further shown that many members of the Mennonite Church and some members of the same church which appellant attends have been naturalized within the past two years, and all testified that they were willing to serve in the armed forces in noncombatant capacities if called upon to do so; that they had been Mennonites all their lives and knew of nothing in the religion which prevented them from serving in the armed forces in a noncombatant capacity; that "our religion teaches 'Thou should not kill' which we think means we should not bear arms, but it does not teach us that we should not wear the uniform"; that their "forefathers wore the uniform in Russia and picked up the wounded on the front."
 The examiner then found, as a result of his interviews, that the Mennonite organization, as a whole, does not teach its members to refrain from service in the armed forces in a noncombatant capacity.
 Appellant presented a statement of a pastor of a Mennonite Brethren Church in Kansas, who knew appellant there for about 10 years. He stated it was his conviction that appellant had conscientiously and considerately developed his present convictions regarding war throughout that period; that his home training program was consistent with the church program in holding that war is sin and that all war relationships must be avoided by Christians; that appellant is a conscientious objector to all war, and as a result of his religious training. The affidavit makes no reference to the nonwearing of the uniform. Appellant related that there were others in the churches who felt as he did and that he individually could not wear the uniform. This statement was corroborated by a minister who testified for appellant. However, he said he knew of nothing in the church teaching indicating that its members should abstain from the wearing of the uniform or performance of noncombatant service. Statements by appellant's mother and brothers relate that appellant's early training was that war or any participation in it was wrong and *387 that appellant was taught he should serve in alternate service outside of the armed forces.
 The examiner's findings analyze the evidence produced. They recite that it may be that resolutions have been passed at general conferences of the Mennonite Brotherhood organizations and that it might be the opinion of certain leaders of the church that its members should refrain from bearing arms or performing noncombatant service, but he maintains that if the organization as a whole does not teach, instruct or train its membership to refuse to perform noncombatant service, then the individual members cannot claim that they received religious training from the organization to that effect. They then conclude that since ministers in the immediate area of petitioner's residence have stated and testified that they believe, from the training received in the Mennonite organization, that they can consistently perform noncombatant service and wear a uniform and still live by the creed of the Mennonites "Thou shall not kill," petitioner's refusal to bear arms or to perform noncombatant service in the armed forces of the United States is based upon a personal fear for his own safety and he is merely attempting to stretch the training of his organization that "thou shall not kill" to include refusal to wear the uniform. They then conclude that petitioner has failed to establish necessary facts permitting him to take the alternative oath. The trial court, in effect, made a similar finding. The Commissioner of Immigration and Naturalization, however, made certain findings and recommended that the petition should be granted.
 Had the trial court found that appellant had met the burden cast upon him and accordingly that he was entitled to take the alternative oath prescribed, it might be properly held that such finding of fact would be supported by the evidence presented. On the contrary, it cannot be said that appellant produced unconflicting evidence and established, as a matter of law and fact, that appellant's refusal to bear arms, refusal to wear the uniform, or to perform noncombatant service in the armed forces of the United States, was based upon his bona fide religious training and belief and was not, as found by the naturalization examiner and the court, based, in part at least, upon his personal fear for his own safety.
 No citation of authority should be necessary to demonstrate our position in respect to such a finding. [3] This court's duty, on appeal, begins and ends with the inquiry whether the trial court had before it evidence upon which an unprejudiced *388 mind might reasonably have reached the same conclusion which was reached. This rule is applicable also where the parties stipulate to the probative facts and different inferences may reasonably be drawn from the agreed facts. (Dunphy v. Dunphy, 161 Cal. 380 [119 P. 512, Ann.Cas. 1913B 1230, 38 L.R.A.N.S. 818]; Crisman v. Lanterman, 149 Cal. 647 [87 P. 89, 117 Am.St.Rep. 167].) [4] When the evidence is conflicting, it will be presumed that the court found every fact necessary to support its order that the evidence would justify. [5] So far as the court has passed upon the weight of the evidence or credibility of witnesses, its implied findings are conclusive even when based upon conflicting affidavits, and where the conflict is not sharp but only such as to create an uncertainty in the mind of the judge. (Hyde v. Boyle, 105 Cal. 102 [38 P. 643]; Kern Valley Bank v. Koehn, 10 Cal.App. 679 [103 P. 173].)
 In La Jolla Casa de Manana v. Hopkins, 98 Cal.App.2d 339 [219 P.2d 871], this court said:
 "A witness may be contradicted by the facts he states as completely as by direct adverse testimony, and there may be so many omissions in his account of particular transactions or of his own conduct as to discredit his whole story. His manner of testifying may give rise to doubts of his sincerity and create the impression that he is giving a wrong coloring to material facts. Where conflicting inferences may be drawn from testimony, this court is bound by the findings of the trial court as conclusively as in other cases of conflict."
 [6] If the finding of fact is based upon a reasonable inference it is not within the power of an appellate court to set it aside any more than it is within its power to set aside any other finding supported by any legal evidence. An appellate court cannot review a finding because in its judgment the inference adduced by the trial court is improbable or more unlikely to be true than the opposite one. Such a finding is as completely a finding based upon good and sufficient evidence as any other finding of fact. (Wallace v. Sisson, 114 Cal. 42 [45 P. 1000]; Kimball v. Semple, 25 Cal. 440.)
 Order affirmed.
 Barnard, P. J., and Mussell, J., concurred.