[Crim. No. 456.   Fifth Dist.   Sept. 6, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. TOMMY
FRANK NOISEY, Defendant and Appellant.

Eugene L. Adams, under appointment by the Court of
Appeal, for Defendant and Appellant.

544

Thomas C. Lynch, Attorney General, Jack R. Winkler and Gordon F. Bowley, Deputy Attorneys General, for Plaintiff and Respondent.

STONE, J.—Defendant appeals from his conviction, by a jury, of kidnaping for the purpose of robbery, the victim suffering bodily harm, Penal Code section 209, two counts of armed robbery, Penal Code section 211a, and two counts of assault by means of force likely to produce great bodily injury, Penal Code section 245. Defendant admitted a prior conviction of felony. The jury was unable to agree upon a verdict as to the guilt of the codefendant, his brother.

Defendant seeks a reversal upon three grounds, each predicated upon a denial of due process of law. He asserts (1) that the identification lineup procedure was purposely designed to focus attention upon him and his brother, which unfairly tainted the identification evidence, (2) that the investigating officers failed to lift fingerprints from articles involved in the crime, and (3) that the prosecution had bloodstains on defendant's clothing analyzed during trial, rather than prior to commencement of trial.

The lineup procedure about which defendant complains, occurred prior to *United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], and *Gilbert* v. *California,* 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951], so the right to counsel at the lineup is not an issue as those cases are given prospective application only. (*People* v. *Feggans,* 67 Cal.2d 444, 448 [62 Cal.Rptr. 419, 432 P.2d 21].) His contention is that the lineup "resulted in such unfairness that it infringed his right to due process." (*Stovall* v. *Denno,* 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967] ; *People* v. *Harris,* 67 Cal.2d 866, 872 [64 Cal.Rptr. 313, 434 P.2d 609] ; *People* v. *Caruso,* 68 Cal.2d 183 [65 Cal.Rptr. 336, 436 P.2d 336].) Defendant attacks the lineup procedure primarily upon the ground the lineup was composed of six inmates of the county jail: defendant and his brother, one man of light complexion, and three men of Mexican descent. From the printed page this strikes one as contrived to focus attention on defendant, who is not of Mexican descent, but an examination of the lineup pictures received in evidence discloses there is little difference in appearance, particularly in complexion, between defendant, his brother, and the men of Mexican descent. Defendant appears to have some of the characteristics of an American Indian and bears a striking physical resemblance to two of the

three Mexican Americans. This bears out the testimony of the deputy sheriff who conducted the lineup and was called as a defense witness. He testified:

"Q. So in other words, if you do not have available inmates that look exactly or real close to the suspect involved, you try to get inmates in the line-up as close to their appearance as you can?

"A. Yes, sir, as nearly identical as possible.

"Q. And there was a question directed to you in regard to people of Mexican nationality. Now, does the nationality as opposed to race of a person have a particular criteria in picking people for a line-up?

"A. Not necessarily. It would be visual appearance more than anything that I have used in the past.

"Q. So in other words, you don't look at the—necessarily the person's last name to determine their possible nationality and use that as a criteria then?

"A. No, sir.

"Q. In regard to having individuals described as Caucasian or white in a line-up, if there were persons who apparently might be of Mexican nationality but had the same approximate skin coloring as the persons described as white, would this be acceptable if they had the same approximate skin coloring and other—

"A. If they visually appeared to be nearly the same, yes. This could be acceptable."

Moreover, the crime was committed about 11 p.m. and the lineup took place at 10 a.m. the following morning, so the victim's recollection of the man who beat and robbed him was less than half a day old.

Giving defendant the benefit of any doubt, in light of the observation of the United States Supreme Court that "there is grave potential for prejudice, intentional or not, in the pretrial lineup, which may not be capable of reconstruction at trial," we review the facts of the case in testing the victim's testimony that his in-court identification of defendant was based upon his recollection of defendant at the scene of the crime and completely independent from the lineup identification. (*United States* v. *Wade, supra,* at p. 240 [18 L.Ed.2d at p. 1164].) In construing the impact of the *Wade* case the California Supreme Court said, in *People* v. *Caruso, supra,* 68 Cal.2d at page 189: "To overcome the effect of the taint, the People must now on *voir dire* show by clear and convinc-

ing proof that the in-court identifications were based upon observations of the accused at the scene of the robbery. [Citation.] 'The phrase ''clear and convincing evidence'' has been defined as ''clear, explicit, and unequivocal,'' ''so clear as to leave no substantial doubt,'' and ''sufficiently strong to demand the unhesitating assent of every reasonable mind.'' ' ''

It is significant that the nexus between the accused and the scene of the crime in *Wade* and *Caruso* was largely circumstantial and tenuous indeed. Here, the victim had many opportunities to observe defendant during the commission of the robbery.

About 10:30 p.m. March 30, 1967, a tan-colored Mustang automobile drove from an access road into the Chevron service station yard where Hubert Replogle was on duty. The driver circled the station twice before coming to a stop north of the pump islands. He called Replogle, who was waiting on a customer at the time, to come to his car. Replogle recalled this quite distinctly for it not only interrupted his work but required him to walk through the rain to the Mustang, parked beyond the cover. He walked to within two or three feet of the driver, subsequently identified as the defendant, confronting him face to face. The driver asked where the rest rooms were. Replogle thought this odd since entrance to the service station property was from the south where the rest rooms were, and anyone entering seeking them need not ask their location. He returned to his customer, completed servicing the automobile, and walked inside the service station office. In two or three minutes the Mustang pulled up to the pumps, Replogle walked to the car and the driver again looked directly at Replogle and said, ''Fill it up.'' Replogle asked him what kind of gasoline and the driver replied, ''Ethyl.'' While the car was being serviced, Replogle noticed defendant get out and, in the rain, walk up and down in front of the office, looking through the window. Replogle testified that he recalled this quite well as it was unusual for a customer to walk back and forth in the rain looking into the interior of the service station. In any event, after filling the gasoline tank, Replogle walked to defendant and said the charge was $5, whereupon defendant said, ''We want a spare tire.'' Replogle was walking into the lube room of the service station where tires were kept, when defendant grabbed his coat from behind and pushed a knife against his back, saying, ''Let's get the money.'' He was swung around, and the man who had been a passenger in the Mustang struck him on his nose about the

same time that defendant struck him on the back of his head. Defendant shoved Replogle into the office, where he was again struck on the back of his head, pushed up against the wall next to the cash box, and held there at knife point by defendant, while the accomplice removed money from the cash box.

In the window Replogle could see the reflection of the knife held at his back. He glanced at the accomplice, but defendant ordered him to turn back to the wall and reached around with the knife, placing it at his throat, saying ''We're going to have to kill this guy.'' Replogle felt a rough or serrated blade against his throat. He quickly said, ''I know where there is some more money''; defendant ordered him to get it. He started toward the storage room but was knocked down and kicked on the right side of his face, head and right side of his body by both men. At that point a car drove into the station and defendant told his accomplice to take care of the customer.

Replogle arose and started to climb a ladder to reach a hole high in the west wall of the storeroom, where money was kept in a sack. In order to keep the knife at Replogle's back, defendant climbed up on some stacked cases of oil cans, but slipped and fell to the floor. Replogle looked down at him, kicked out and missed, and when defendant straightened up, Replogle took the money from the hole and handed it to him. Although there were no lights in the storeroom, it was well lighted through a wide door to the lubrication area, so that Replogle could see defendant clearly as he handed the money to him. Defendant jerked Replogle off the ladder and shoved him against a back door. The accomplice came in and hit him a couple of times; Replogle slipped to the floor, protecting his head with his hands, and defendant asked, ''Do you want us to kill you or knock you out?''; he replied, ''Knock me out.'' At that moment defendant was bending over, his face about a foot and a half from the victim, who was looking at him. The accomplice then struck Replogle on the back of the head with the metal end of a mop handle. Replogle feigned unconsciousness and the accomplice, under orders from defendant, left to start the car. After again hitting Replogle and kicking him twice, defendant left. The back of Replogle's head and his nose were bleeding.

The driver of the car that entered the service station in the meantime turned out to be another employee, Larry Sebilian, who had arrived to help close the station at 11 o'clock. As he stopped his pickup alongside the first row of pumps, he no-

ticed the parked Mustang just as the accomplice stepped up and told him to wait in the pickup, adding, "You had better do what I say if you know what's good for you." As he waited, Sebilian memorized the license number of the Mustang. In a very short while a man opened the pickup door and told Sebilian to lie on the floor on his stomach and to give him all of his money. When he hesitated the man reached into Sebilian's left rear pocket and took his wallet containing several credit and identification cards and a couple of dollars. Sebilian was ordered to raise his head, whereupon he was struck four or five times with the metal end of a mop handle; he feigned unconsciousness, and the man left.

Thirty to thirty-five minutes elapsed from the time Replogle first saw the Mustang enter the premises until it left. He immediately called the sheriff's office, reported the robbery, and gave the officers who responded a description of the defendant. Sebilian gave them a piece of paper with the license number of the Mustang written on it, and a description of the accomplice. About two hours later, at 1:45 a.m., one of the investigating officers received a call that a tan-colored Mustang had been observed speeding along the freeway. As the deputy entered the freeway from an access road, a tan Mustang bearing the license number given by Sebilian passed by, going about 80 miles an hour. When the officer stopped the Mustang, he discovered the driver was the defendant with the brother a passenger. Sebilian's wallet, his driver's license still in it, was found on the front seat along with a white-handled, serrated-edge steak knife.

The arresting officer radioed for help and when reinforcements arrived, they advised defendant he was being placed under arrest for suspicion of armed robbery and grand auto theft. They also advised him of his constitutional rights; he replied that he understood them. They did not question him, but on the way to jail, defendant volunteered, "You cannot pin this robbery on me. I was at The Swinger all night." The significance of the statement lies in the fact defendant had not been told whether the robbery for which he was arrested occurred that night or at some prior time. A search of defendant at the station turned up $98.79 on his person, one $20 bill, two $10 bills, 41 $1 bills, 30 quarters, 14 dimes, 12 nickels, and 29 pennies. Replogle testified that the cash box usually contained between $80 and $90 in similar denominations.

The following morning, at 10 o'clock, Replogle and Sebilian viewed a lineup of six persons at the sheriff's office. Replogle identified defendant but could not make a positive

identification of his brother. He also made a positive in-court identification of the defendant.

The record supports Replogle's testimony that his in-court identification of defendant was based upon his observation of defendant at the scene and during the course of the commission of the crime, not upon the lineup identification.

We advert to the distinction between facts of this case and those of *Wade* and *Caruso,* in that here we have corroboration of Replogle's in-court identification of defendant by other evidence linking defendant to the crime. Sebilian, the other victim, memorized the license number of the Mustang which defendant drove when he entered the station and in which defendant was sitting when he called Replogle over and asked about the restroom. When arrested between two and two and a half hours after the commission of the crime, defendant was driving that Mustang. On the seat was Sebilian's wallet, a steak knife with a serrated edge, and a great deal of change totaling approximately the amount Replogle thought was taken from the cash box.

Defendant linked himself to the crime, unwittingly, by a statement he intended to be exculpatory. When told he was being arrested on suspicion of armed robbery and grand theft auto, he volunteered, "You cannot pin this robbery on me. I was at The Swinger all night." Since he was not told when the alleged robbery had been committed, he evinced a guilty knowledge of a robbery occurring the night of his arrest.

From the factual account of this case, it appears clear that the in-court identification of defendant by his victim, Replogle, was neither directly nor indirectly aided nor tainted by the lineup identification. We conclude, therefore, that even if the introduction of the lineup identification evidence could be said to constitute error, it was harmless error. (*United States* v. *Wade, supra*; *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824] ; *People* v. *Caruso, supra*.)

Defendant's second alleged denial of due process is grounded upon the investigating officer's failure to attempt to lift fingerprints at the scene of the crime and from objects identified with the commission of the crime. This failure to investigate and develop evidence, defendant equates with a wilful suppression of evidence which, it is well established, constitutes a denial of a fair trial and of due process. No case is cited for this proposition, but it would certainly follow that a wilful failure by investigating officers to obtain evidence which would clear a defendant would amount to a denial of

550

due process of the law. The only cases we find bearing upon the question are against defendant's position. For example, in *People* v. *Tuthill,* 31 Cal.2d 92, the Supreme Court said, at pages 97-98 [187 P.2d 16] : ''The defendant argues that an examination of the gun barrel might have disclosed the finger prints of the deceased and support the theory of an accidental killing; that a paraffin test of defendant's hands within a few hours after the shooting might have determined whether he shot the gun; that proof of the presence or absence of powder marks on the head of the victim might have helped the defense; and that various other witnesses might have been produced by the prosecution and other tests might have been applied.

''There is no compulsion on the prosecution to call any particular witness or to make any particular tests so long as there is fairly presented to the court the material evidence bearing upon the charge for which the defendant is on trial.'' (See also *People* v. *Wright,* 258 Cal.App.2d 762, 767 [66 Cal.Rptr. 95] ; *People* v. *Grey,* 180 Cal.App.2d 683, 687 [4 Cal.Rptr. 561].)

The mere fact investigating officers do not pursue every possible means of investigation does not, standing alone, constitute a denial of due process or suppression of evidence. A failure to look for evidence is quite different from suppressing known evidence, but in either case the defendant must demonstrate that he has been prejudiced thereby. In the instant case, in view of the substantial evidence of defendant's guilt, a miscarriage of justice would result were his conviction to be reversed simply because the officers took no fingerprints. .

■ Defendant's third assertion of denial of due process arises from the delay in testing blood spots on the clothing he was wearing at the time of his arrest. The test was not made until after two days of trial. The gist of defendant's argument is that he was entitled to have this information before trial through pretrial discovery, and that late testing denied him the ''opportunity to investigate concerning the blood tests or to take any other appropriate steps which might exist to counteract this evidence.''

The objection coming for the first time on appeal is too late; it should have been raised when the blood tests were introduced as evidence in the trial court. Moreover, defendant does not now point out how he might have counteracted the evidence, or in what manner he was prejudiced. It is not the duty of an appellate court to speculate upon prejudice,

particularly in the absence of an objection at the time evidence is offered.

The judgment is affirmed.

Conley, P. J., and Gargano, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 30, 1968.