**People of the State of Illinois, Plaintiff-Appellee, v. Willie H. Moore, Defendant-Appellant.**

Gen. No. 52,298.

First District, Fourth Division.
December 31, 1968.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Ronald P. Katz and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Howard Levine, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE ENGLISH delivered the opinion of the court.

OFFENSE CHARGED
Theft from person. Ill Rev Stats (1965), c 38, § 16–1 (a).

DEFENSE AT TRIAL
Alibi.

JUDGMENT
After a bench trial, defendant was found guilty and sentenced to a term of 3 to 5 years.

POINTS RAISED ON APPEAL
Defendant was not proven guilty beyond a reasonable doubt.
(1) Money allegedly taken from the victim was not properly identified.
(2) Defendant was not adequately identified as the robber.

(3) Defendant presented a reasonable excuse for his presence in the vicinity of his arrest.

*Mrs. Mary Paul,* for the State

On July 29, 1966, at approximately 4:30 p. m., she cashed a $74 check at a currency exchange near the corner of Madison Street and Damen Avenue in Chicago. She received six ten-dollar bills, two fives, and four ones, which she placed in her wallet. She left the currency exchange holding her wallet in her right hand and holding the hand of her six-year-old son with her left hand, and walked west on Madison to the intersection of Damen. The day was warm and sunny. As she was standing on the corner preparing to cross the street, she noticed defendant as he was crossing Madison Street towards her. At that time, she looked at his face. She identified defendant in court as that man, although when she saw him on the street he had a thin mustache but he did not have the goatee he was wearing in court. Defendant walked up to her as if he were going to pass, then jerked the wallet from her hand, and fled north on Damen. She began to scream and gave chase for about a half block, but she soon lost sight of him when he turned into the alley, because she was pregnant and couldn't run fast. As the man ran, he turned back to look at her. Another man, later known to her as a Mr. Simmons, ran after the one who had taken her wallet.

She next saw defendant about five minutes later near the corner of Warren and Hoyne Avenues. At that time, defendant was in the custody of Police Sergeant Michaelson. Mr. Simmons was there also. She told the officer, "That's the man that got my wallet." Defendant was searched and $74 was found in his pocket. She saw the money at that time, and it was in denominations of six tens, two fives, and four ones. They didn't recover the wallet. The money was returned to her at the police station.

On that day, defendant was wearing dark trousers and "some kind of sweater shirt."

*Claude Simmons,* for the State

At approximately 4:00 p. m. on July 29, 1966, he was standing on the corner of Madison and Damen waiting to cross the street, when defendant sort of pushed him from behind. He spun around to see Mrs. Paul yelling that defendant had taken her money. He saw defendant running north on Damen, and he started chasing him. He was joined by others and followed defendant into an alley, through a lot, and on to Warren Boulevard. He lost sight of defendant for about three or four minutes, and next came across him at Hoyne Avenue in the custody of police officers.

Mrs. Paul came up shortly after him and told the police that defendant had taken $74. He identified the defendant to the policeman and told him that "He grabbed the lady's purse." He then watched the policeman search defendant and take $74 out of his pocket. He did not recall the denominations of the bills.

During the chase, defendant looked back over his shoulder quite a few times; so he had an opportunity to see defendant's face. He ran about 20 to 25 feet behind defendant, and sometimes closer, before he lost him. Defendant was wearing a sweater type shirt and slacks. He identified defendant in court, adding that at the time of the robbery he had a mustache but he did not have a beard, as he had in court.

*Police Sergeant John Michaelson,* for the State

On July 29, 1966, at approximately 4:30 p. m., he was patrolling his assigned beat in the vicinity of Madison and Damen when a motorist drove up honking the horn and yelling at him. They had a conversation, after which he followed that car west on Madison Street. He saw defendant (identifying him in court) run around the corner of Hoyne and Warren, walk across the street, and stop by an alley. He placed defendant under arrest. Defendant

347

was "pooped." Defendant denied any knowledge of the crime. A man now known to him as Claude Simmons arrived, and in a few minutes Mrs. Paul came up. They identified defendant as the thief. Mrs. Paul explained that defendant had taken $74 in denominations of six tens, two fives, and four ones. He then searched defendant and found exactly $74 in one pocket in the denominations claimed by Mrs. Paul to have been taken from her.

While they were standing there, a man from the Halfway House came up to defendant, had a conversation with him, and gave him a couple of dollars for cigarettes.

Defendant, on the day of arrest, wore dark slacks and had a small mustache. His hair was longer than at trial and he did not have a goatee.

Other officers on the beat (Hardy and Redelsterger) had a conversation with Mrs. Paul about the robbery and made up reports. When a Sergeant makes an arrest, the "beat car officers" make out the report. In a general case report made by these officers, an inventory was taken of property on defendant at the time of arrest. It stated that $74 in denominations of one twenty, four tens, two fives, and four ones were taken from defendant. Although the witness' name was typed on the report, he had never seen it, and his name was spelled wrong. He didn't believe that a $20 bill was taken from defendant, but, rather, six tens. A detective also made out a report which he never saw.

*Willie Moore*, defendant, on his own behalf

He left his second-floor residence at 308 S. Leavitt Avenue at approximately 2:45 p. m. en route to St. Leonard's House ("Halfway House") located near the corner of Hoyne and Warren. When leaving, his grandmother, with whom he lived, had given him $77 to pay the rent of $65 to his aunt, the manager, who lived on the first floor, and to use the rest to get an apartment of his own. The money was counted out in his hand and

348

consisted of one twenty, four tens, two fives, and seven ones. Finding no one at home at his aunt's apartment, he left for St. Leonard's House to keep an appointment with Father Taylor. Of the $77, he put $3 in his watch pocket in hopes of getting the apartment for less than $12. He then took a leisurely walk to St. Leonard's House which was five blocks away.

About 4:30 p. m., he was arrested near the corner of Hoyne and Warren, across the street from the Halfway House. The officer jumped out of his car and arrested him for snatching some woman's pocketbook. He denied it, and he denied being near the intersection of Madison and Damen that day. They waited for a few minutes, when Mrs. Paul came up and said he looked like the man. The policeman searched him and found in his pocket $74 of the $77.

Father Taylor then came over from St. Leonard's House, talked to him briefly, and gave him two quarters to get cigarettes.

He was then taken to the police station where, out of his presence, they inventoried the property taken from him. The inventory showed he had one twenty, four tens, two fives, and four singles. He used the two quarters to buy food at the police station. On July 30, he was admitted to the County Jail where they inventoried the remaining $3.

On the day in question, he was dressed in gray slacks, a light blue short-sleeved shirt, a pair of sunglasses, and a black straw hat. He did not have a goatee at that time.

*Mrs. Addie Thrower,* for the defense

She lives with her grandson on the second floor of 308 South Leavitt. She receives $72 per month in assistance money and pays $65 per month rent to her daughter who lives on the first floor. On July 29, 1966, she gave defendant $77 to pay the rent and to use for himself. She remembered that the money included one twenty and four tens. She did not remember whether the rest in-

349

cluded one five or two fives. "It was not all fives and tens. They were twenties and tens."

Defendant left about 2:30 or 3:00 p. m. on that day, wearing gray pants, a blue shirt, a black straw hat, and sunglasses.

OPINION

(1) Defendant claims, first, that he was not proven guilty beyond a reasonable doubt because the State did not prove that the money found in defendant's possession was the money that was taken from Mrs. Paul. He bases this claim on what he contends is a fatal discrepancy in the evidence as to the denominations of the bills found on defendant upon arrest. Mrs. Paul testified that she had cashed a check for $74 at the currency exchange and received six tens, two fives, and four ones. Mrs. Paul and Sergeant Michaelson testified that the money found on defendant was precisely in those denominations. Defendant testified, and the general case report (which was made out by the beat car officers) stated, that when defendant was arrested, he possessed one twenty, four tens, two fives, and four ones. Defendant's grandmother corroborated his testimony by saying that the $77 she gave him included a twenty-dollar bill.

In People v. Lagios, 51 Ill App2d 440, 201 NE2d 245, the victim of a robbery claimed that he had been paid $285 in various denominations, including a one hundred-dollar bill. The defendant was stopped by a policeman after he had been chased for several blocks. On him was found $269, including two fifties but no hundred-dollar bill. To the claim that the discrepancy about the hundred-dollar bill and the variance between the amount taken and the amount found on defendant created a reasonable doubt, the court said:

> The value of property taken is immaterial and its precise identification is unnecessary if the character of the property is such that exact identifica-

tion is difficult. People v. Carpenter, 315 Ill 87, 145 NE 664. This is particularly true of money which, in most instances, cannot be positively identified unless it bears some peculiar mark or designation not common to all currency. People v. Rembowicz, 335 Ill 604, 167 NE 797. (51 Ill App2d 440, 443, 201 NE 2d 245.)

That case is not significantly distinguishable from the one now before us.

█ In the present case, the money recovered was not introduced into evidence. The question therefore becomes one of credibility of the witnesses, including the correctness of the general case report. In light of the positive identification of defendant, the immediate recovery of the exact amount of money taken in the robbery, and the unshaken identification of the money in possession of defendant upon arrest, the report of the beat car police officers could have been in error on this point, and we do not believe that this minor discrepancy raises reasonable doubt of defendant's guilt to overcome the decision of the fact finder.

(2) Defendant next claims that the on-the-street identification confrontation with Simmons and Mrs. Paul, while he was in custody of Sergeant Michaelson, was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law. He further claims that the prosecution failed to establish, by clear and convincing evidence, that Mrs. Paul had had sufficient independent and uninfluenced observations of her assailant to render admissible her in-court identification. He also claims that Mrs. Paul's observation of the robber was such a fleeting glimpse that it was insufficient to prove his identification beyond a reasonable doubt.

█ █ Defendant's claims are based on Stovall v. Denno, 388 US 293, which held that a confrontation between a victim and an accused, within the totality of the

circumstances surrounding it, may be so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny due process of law; and that an in-court identification based on such a confrontation is therefore inadmissible. When coupled with its sister cases, United States v. Wade, 388 US 218, and Gilbert v. California, 388 US 263, a standard has been established governing the admissibility of in-court identification in relation to testimony concerning pretrial identification of an accused under the due process clause. People v. Nelson, 40 Ill2d 146, 238 NE2d 378; People v. McMath, 104 Ill App2d 302, 244 NE2d 330; People v. Caruso, 65 Cal Rptr 336, 436 P2d 336; People v. Ballott, 20 NY2d 600, 286 NYS2d 1, 233 NE2d 103. Also see Palmer v. Peyton, 359 F2d 199. We believe, on the facts now before us, that the in-court identification was properly admitted under Stovall, supra, and that the prearrest observations of defendant constituted a sufficient basis for the identification testimony.

■ To support these conclusions, we point, first, to the fact that the unshaken identification by Mrs. Paul, based on her brief view of defendant at the time of the robbery, her observance of him during the chase, and her viewing of defendant when he was in custody of Sergeant Michaelson, were all parts of the same identification. Or, if not the same identification, then they are clear and convincing, independent and uninfluenced observations within the rule of Stovall, Wade, and Gilbert, supra. We reach the same conclusion as to the identification of defendant by Simmons.

We feel that this type of on-the-spot identification was contemplated by the courts as furnishing adequate independent-origin foundation for in-court identification. We reach this conclusion, perhaps somewhat obliquely, from the cases dealing with the evils of suggestive identifications in the context of police-station confrontations. People v. Nelson, supra, affirmed a conviction because the record established that the witnesses had prior acquaint-

352

ance with the defendant and had sold narcotics to him; People v. Caruso, supra, reversed a conviction because the witnesses had seen the robber for only a few seconds at the time of the robbery and had lost sight of him without pursuit; People v. Ballott, supra, reversed and remanded a conviction for the trial court to determine whether the witness could identify the defendant on the basis of her observation at the time of the robbery; and Palmer v. Peyton, supra, reversed a conviction because there was no showing that the witness had had sufficient opportunity to observe the defendant during the commission of the crime. In People v. Brown, 20 NY2d 238, 282 NYS2d 497, 229 NE2d 192, a conviction was affirmed because the record disclosed that the victim had spent a considerable amount of time with the defendant before and during the commission of the crime.

Also, we feel that due process does not require that the rule of Stovall, supra, be made applicable to on-the-spot identification confrontations of the kind presented by the case now before us. It appears that the evil to be corrected is in the "showup" confrontation, the weaker alternative to the "lineup. The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." Stovall v. Denno, 388 US 293, 302. The practice of police showups is condemned, because after a period of time, even as short as a few hours, a person's memory will begin to fade and become more susceptible to the suggestive nature of police custody and to other suggestive circumstances. The unfairness feared requires close scrutiny when a defendant has been identified through a showup while in station house custody. In Stovall, supra, the court, limiting itself to the particular facts of that case, found no reversible error in a one man "showup" conducted in a hospital room under tight police supervision because of the desirability of immediate identification. And this result was reached even though the victim-witness saw the defendant only after he had been

charged with the crime and arraigned. In Palmer v. Peyton, supra, and People v. Ballott, supra, the courts condemned as suggestive police station show-up identifications under circumstances which could easily have provided lineups. So far as we know, however, the procedure involved in on-the-spot identification has never been condemned. There appears to be no readily available reasonable alternative to the on-the-spot identification. It furnishes a desirably quick and sure way of establishing either probable cause for arrest or its opposite. When properly employed, it affords a real opportunity to an innocent person to avoid the needless detention which would follow if a formal lineup were conducted. As stated in Stovall:

> Here was the only person in the world who could possibly exonerate Stovall. Her words, and only her words, "He is not the man" could have resulted in freedom for Stovall. (388 US 293, 302.)

■■■■ We turn, then, to defendant's claim that the identification evidence (apart from the Stovall issue) was doubtful, vague, and uncertain, and failed to establish defendant's guilt beyond a reasonable doubt. While the identification of defendant by the witnesses was made while observing him alone in police custody, this can be sufficient, and the identification procedure is merely one of the factors to be weighed by the trier of fact. People v. Benjamin, 53 Ill App2d 249, 203 NE2d 74; People v. Boney, 28 Ill2d 505, 192 NE2d 920; People v. Washington, 26 Ill2d 207, 186 NE2d 259. Here, we have the unshaken testimony of Mrs. Paul identifying defendant as the robber. She saw him briefly as he snatched her wallet, and her eyes followed him down the street as he fled. It was a clear and sunny day. A positive identification by one credible witness can be sufficient for conviction, though contradicted by the accused. People v. Boney, supra; People v. Washington, supra. In

this case we also have Simmons' strong testimony fully corroborating that of Mrs. Paul. See People v. Thompson, 406 Ill 555, 94 NE2d 349. The evidence was more than adequate to withstand defendant's attack on this issue.

██ (3) Defendant claims finally that he was not proven guilty beyond a reasonable doubt because defendant's partially supported alibi was that he was on his way to an appointment with Father Taylor at St. Leonard's House, and he was, in fact, arrested across the street from St. Leonard's House. This, he claims, was sufficient excuse for his presence in the vicinity. We believe that the only issue thus raised is that of the credibility of opposing witnesses and this testimony is to be weighed with all other evidence. Defendant tries to enhance the credibility of his testimony by claiming that his alibi places him near the scene of the crime, while most alibi defenses place the accused miles away from the scene of the crime. This is a distinction without a difference and note the appropriateness to this case of the following language:

> The trial court, as it properly could, believed the testimony of certain witnesses and disbelieved the testimony of others. In a bench trial no citation of authority is needed to support the rule that credibility of the witnesses is solely a question for the trial court and will not lightly be disturbed. An examination of the record indicates that there was no reasonable doubt as to the guilt of the defendant. People v. White, 63 Ill App2d 105, 112.

DECISION

The judgment and sentence of the Circuit Court are affirmed.

Affirmed.

McCORMICK, P. J. and DRUCKER, J., concur.