[Crim. No. 15202. Second Dist., Div. Four. Oct. 29, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. CAMDEN THOMAS DAVIDSON, Defendant and Appellant.

**COUNSEL**

Camden Thomas Davidson, in pro. per., and Gloria Reed, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas Kallay, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**JEFFERSON, Acting P. J.**—A jury found defendant guilty of murder in the first degree and fixed the penalty at life imprisonment. Defendant appeals from the judgment.

On January 4, 1967, at about 5:15 p.m., a boy playing in a large field

adjacent to a Torrance shopping center found the body of the victim Jerry Stonebarger. The police called by the boy's mother arrived at the scene at about 5:45 p.m. They observed that the victim had been shot twice in the head. There were tire tracks near the body. Later the same night the officers found Stonebarger's 1954 Cadillac parked on 68th Street in Lakewood, about a block from the American Electric Company where he had been employed. A large quantity of blood, stipulated to be that of the victim, was found on and around the driver's seat of the vehicle. The seat and steering wheel appeared to have been wiped off. Two small holes were discovered in the headliner near the driver's door where a bullet entered and exited. A spent bullet was found on the floor of the car. Additional blood was found on the outside on the driver's door and left rear fender.

On December 17, 1966, a few weeks before the killing, defendant was told by David Quiroz, a 16-year-old boy who baby-sat for defendant's wife Yolanda, that Stonebarger had spent the night with Yolanda. He told defendant about an address book Yolanda kept which had Stonebarger's name in it. Defendant secured the address book from Mr. Moncy, a friend of Yolanda. The latter had given the book to Mrs. Moncy for safekeeping when she learned defendant was getting out of jail. The book contained the names and phone numbers of several men including the victim. Mrs. Moncy told defendant in reply to his questioning that Stonebarger had spent the night with Yolanda; that they had met at a bar which Yolanda frequented. In the presence of both David and Mrs. Moncy, defendant said that he was going to look up all of the men in the address book and that he was going to kill them. At the time defendant said this he pulled a pistol out of his waistband and began playing with it.

At about 3:30 p.m. on January 4, 1967, Stonebarger got off work at the American Electric Company and walked out to his car in the parking lot. A fellow worker, Jose Cabrera saw him after he got into the car. Cabrera saw defendant standing next to the car on the passenger side trying to get in. Defendant succeeded in getting into the car and sat down in the front passenger seat. Cabrera passed by only a few feet from defendant and looked directly at his face. After defendant got into the car, Cabrera observed that Stonebarger looked "panicked" and his face turned red. Defendant made a motion with his hand in the direction of his waistband. Stonebarger then drove the car slowly out of the parking lot. Usually, he would drive out "real fast."

Mrs. Rita Rhoades was waiting in her car for her husband, one of Stonebarger's coworkers, when she saw Stonebarger drive out of the parking lot. She saw defendant seated next to Stonebarger. As the car passed by she was going to wave to Stonebarger but he kept looking straight ahead. He seemed very serious. It was strange because he was usually laughing.

On his way home after leaving the American Electric Company, James Plymale, another of Stonebarger's coworkers, saw Stonebarger proceeding south on Paramount Boulevard. (This is the general direction of the Torrance shopping center near where Stonebarger's body was found less than two hours later.) Stonebarger was driving quite slowly, at about 15 or 20 miles per hour when Plymale saw him. He normally drove much faster. Plymale saw that there was another man in the car with Stonebarger. He was in the back seat on the right side. Because Stonebarger was going too slow, Plymale passed him. As he came alongside he honked in recognition and looked over. He observed that the man in the back seat was defendant. Stonebarger looked over and gave Plymale a quick wave and then quickly looked back.

On January 4, 1967, Theodore Ostrowski lived at 6795 Paramount Boulevard, about a half a block away from the American Electric plant. He did not work at the plant, but was acquainted with Stonebarger. At about 4:15 p.m., as he drove up 68th Street and approached his home he observed Stonebarger's car ahead of him. There was one person in it. It was not Stonebarger. The car parked across the street from the driveway to his parking area. As he drove by and pulled into the driveway, he observed that the man who got out of the car was defendant.

It takes approximately 15 minutes, driving at a speed of about 25 miles per hour, to drive from the American Electric plant to the field in Torrance where Stonebarger's body was discovered.

An autopsy revealed that the two gunshot wounds in the head were the cause of death. The bullets were fired from a weapon at close range.

Defendant was arrested on January 5, 1967. On January 8 he was a cellmate of one Archie Cook. The latter was then in jail on charges of burglary and forgery. Cook was released on January 10 but was picked up the following day when information was received that he was wanted in both Oregon and Kansas. At that time he told the officers about a conversation which he had with defendant on January 8 while they were alone in a cell. Defendant had asked Cook what the charges against him were and Cook told him. Defendant then said that if they had him (Cook) "cold" it would be best to cop out. Cook then asked defendant what he was in for. Defendant replied that he "blew a guy up." Cook inquired "With dynamite?" Defendant stated "No. I shot him in the head." Defendant further stated that it was on account of the man sleeping with his wife. Cook related that he told the officers about the conversation because he thought he might be given "a break." He indicated that no promises were made to him in return for the statement.

Defendant testified that he went to the American Electric Company on

the afternoon of January 4 to talk to Stonebarger. He wanted to find out if Stonebarger had slept with his wife. She had denied it and told him that Stonebarger would tell him the same thing. When Stonebarger got into his car, he walked over and told him that he would like to talk to him. Stonebarger told him to get in. When he introduced himself, Stonebarger told him he knew who he was and invited him to go have a beer. As they were driving out of the parking lot he asked Stonebarger if he had slept with his wife. Stonebarger said that he had not; that he saw her at a bar a few times and took her out to dinner once, but that was all. As they passed the corner of 68th and Paramount a man called Stonebarger's name. The car stopped and the man came up. Stonebarger invited the man to get in. Defendant got in the back seat and the man sat in front. They drove around for a short time while Stonebarger and the man had a conversation which defendant did not pay attention to. Stonebarger then stopped again at the corner of 68th and Paramount. He turned to defendant and told him that his wife was "O.K." and that nothing had happened between them. Defendant then got out and walked over to the plant parking lot where he had left his car. That was the last time he saw Stonebarger.

Defendant's wife corroborated defendant's testimony that she had told him that she had not had an affair with Stonebarger.

Rebuttal evidence of a statement defendant's wife made to the investigating officers was introduced. She told the officers after defendant's arrest, that when defendant had confronted her with the address book, she admitted to him that she had had an affair with Stonebarger.

Defendant raises several contentions in this appeal, all of which relate to the guilt phase of the trial.

■ Initially, defendant contends that the evidence does not establish "beyond a reasonable doubt" that he fired the fatal shots. ■ However, the test of the sufficiency of evidence on appeal is not whether guilt is established beyond a reasonable doubt, but whether there is substantial evidence in the record to support the conclusion reached by the trier of fact. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].) ■ Applying the proper test, it cannot be seriously argued that the evidence fails to establish that defendant killed the victim.

The evidence shows that defendant stated a few weeks before the killing that he would kill Stonebarger. Defendant had a motive to do so. He was then carrying a gun. Defendant was positively identified by several witnesses as the man in the car with the victim when he drove out of his employer's parking lot and headed in the direction of the place where he was later found shot to death. Defendant was positively identified by another witness as the man who later returned alone with the car and parked it near

the parking lot, shortly before the discovery of the victim's body. It was determined that the victim was shot (at least once) at close range while he was in the driver's seat of the car. On top of this evidence, defendant told a cellmate after his arrest that he committed the crime and explained why he did it. In his testimony, defendant admitted that he went to talk to the victim about the latter's running around with his wife. He admitted that he was in the car when the victim drove out of the plant parking lot. It was within the province of the jury to disbelieve his uncorroborated tale about the victim thereafter stopping and picking up another man who drove off with the victim after he got out of the car. By any standard, the evidence of guilt must be regarded as overwhelming.

■ Defendant next contends that the identification testimony of one of the prosecution witnesses was tainted by an unfairly constituted lineup. The lineup in question was held about one week after January 4, 1967.[1] The witness Mr. Plymale testified on direct examination, that on the way home from work on January 4, he passed the victim's car and observed that defendant was driving in the car with the victim; this was the first time he had ever seen defendant; he got a good look at defendant's face and profile and was positive it was defendant; he saw defendant two times after that, once at a lineup and then at the preliminary hearing; he identified him on both occasions. He positively identified defendant at the trial.

As to the composition of the lineup, further questioning by the prosecutor elicited from Plymale that there were four men in it; they looked pretty much the same; two were about the same height and stature as defendant; the third was a little bit heavier; the fourth was taller; one (not defendant) appeared to be of Mexican descent and had a little darker complexion.

■ Before a defendant may invoke the exclusionary rule on the ground that a lineup is unfairly constituted, "he must demonstrate that the lineup 'resulted in such unfairness that it infringed his right to due process of law' (*Stovall* v. *Denno* (1967) 388 U.S. 293, 299 [18 L.Ed.2d 1199, 1205, 87 S.Ct. 1967])." (*People* v. *Caruso,* 68 Cal.2d 183, 184 [65 Cal.Rptr. 336, 436 P.2d 336].) Before he is entitled to a reversal, there must be a showing not only that the lineup was unfair but that it resulted in

---

[1] It is to be noted that since the lineup was held prior to the June 12, 1967 decisions in *United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], and *Gilbert* v. *California,* 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951], defendant may not complain that he was required to appear at the lineup without counsel. (*Stovall* v. *Denno,* 388 U.S. 293, 300-301 [18 L.Ed.2d 1199, 1206-1207, 87 S.Ct. 1967]; *People* v. *Feggans,* 67 Cal.2d 444, 448 [62 Cal.Rptr. 419, 432 P.2d 21].) The record does not in fact show whether or not defendant was represented by counsel at the lineup, or whether he was advised of and waived this right.

a "tainted in-court identification essential to the People's case." (*People* v. *Caruso, supra,* at p. 184.)

No showing of unfairness is made here. The lineup was composed of only four rather than the usual six to eight persons. But this factor was counterbalanced by the similarity in appearance of all those in it. Furthermore, even if the lineup was found to be unfair, there is no showing that the identification made there, in any way, tainted the in-court identification of the witness (who was but one of several witnesses who observed defendant in the car with the victim).

In any event, since there was a complete failure by defendant to make any issue of the fairness of the lineup by objecting to or moving to strike the witnesses' courtroom identification, and since the trial (held in November and December 1967) followed by several months the June 12, 1967 decisions in *Stovall, Wade* and *Gilbert,* defendant is precluded from urging the point for the first time on appeal. (*People* v. *Keel,* 272 Cal.App.2d 275 [77 Cal.Rptr. 298]; *People* v. *Castro,* 257 Cal.App.2d 643, 645-646 [65 Cal.Rptr. 62].)

Defendant argues that the judgment must be reversed because the evidence shows he was not taken before a magistrate within two days after his arrest as required by Penal Code, section 825. A meager record is presented on this point. Defendant testified (at a pretrial hearing on a motion to dismiss the information) that on January 5, 1967, he was taken into custody on a unrelated burglary charge. On January 9th he was informed by an officer "Don't worry about any bail on the burglary charge because you have a murder hold as of right now." The next day he went to court to ask for a reduction of bail on the burglary charge. The court then informed him that he was a prime suspect in a murder case and increased the bail. He was arraigned on the murder charge on January 17th.

During the course of the trial one of the investigating officers testified that on January 9th he advised defendant of the murder charge against him. At the same time he advised defendant of his constitutional rights.

Penal Code, section 825, states that a defendant must be taken before a magistrate without unnecessary delay and in any event within two days after his arrest. Defendant's testimony indicates that he was taken before a magistrate on January 10th, one day after the murder charge was made. The record does not reflect the entire proceedings on January 10th. It was stipulated that defendant's arraignment before the magistrate was on January 17th, one week later. Even assuming that the required proceedings did not take place until the latter date, and that section 825 was, therefore, violated, " 'A violation of a defendant's right to be taken

before a magistrate within the time specified by the law does not require a reversal unless he shows that through such wrongful conduct he was deprived of a fair trial or otherwise suffered prejudice as a result thereof.' " (*People* v. *Hill,* 66 Cal.2d 536, 551 [58 Cal.Rptr. 340, 426 P.2d 908].)

■ The record affords no basis for a finding that defendant suffered any prejudice or that he was deprived of a fair trial by reason of any delay in bringing him before the magistrate. Defendant made the incriminating statement to his cellmate Archie Cook on January 8th. It was stipulated at the trial that defendant was then still in custody on the unrelated burglary charge.

■ The argument is raised that the trial court erred in permitting one of the investigating officers to give objectionable conclusionary and non-responsive testimony. Defendant refers to the testimony of Sergeant Betkey. On cross-examination, defense counsel asked Betkey to relate the substance of his conversation with defendant on January 9th. The officer testified that he first informed defendant of the murder charge against him; that he then advised defendant of his constitutional rights; whereupon defendant stated that he did not want to discuss the matter with him but wished to secure the services of an attorney. The officer further testified that, on the way out of the interview room, he made the comment to defendant, "Boy, I am sure glad I am not the one that was running around with your wife while you were in jail."; when he made this comment defendant smiled very broadly and "swelled up like a bantam rooster."; he regarded this to be a "tacit admission" by defendant.

It is to be observed that the above testimony was elicited by defendant's attorney, not the prosecutor. Indeed, as defendant suggests, the latter testimony was objectionable. But no objection to it was made. Counsel neither moved to strike the statement nor asked for a jury admonition to disregard it. Under the circumstances, since defendant never brought the matter to the attention of the trial court, he is precluded from urging the point now for the first time.

■ Defendant maintains that the jury should have received manslaughter instructions. ■ Such instructions must be given ". . . if there was presented 'any evidence deserving of any consideration whatever' which tended to negate malice aforethought and therefore would warrant conviction of manslaughter as 'the unlawful killing of a human being, without malice.' " (*People* v. *Morse,* 70 Cal.2d 711, 732 [76 Cal.Rptr. 391, 452 P.2d 607].) ■ The defense presented by defendant was that the victim was killed by a third person and not defendant. All of the prosecution evidence indicated that it was a cold-blooded killing. Despite defendant's assertion to the contrary, no evidence was presented

that it was a homicide committed in the heat of passion. Nearly three weeks had elapsed since defendant had learned of his wife's affair with the victim. ■ "[B]efore a homicide may be classified as voluntary manslaughter, it must appear that there was no 'cooling' period, that is, after the 'heat of passion' was reasonably and justifiedly engendered, 'hot blood had not had time to cool' before the fatal act was committed, that is, the act that engendered the 'hot blood' had occurred so shortly before the killing that reason had not had time 'to resume its empire.' " (*People* v. *Taylor,* 197 Cal.App.2d 372, 380 [17 Cal.Rptr. 233].)

■ Defendant suggests that Archie Cook was a police informer planted in his cell to elicit incriminating statements; that since Cook was acting for the police, the evidence of the statement he made to him was inadmissible in the absence of a warning of his rights as required by *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 160, 10 A.L.R.3d 974]. Absolutely no evidence was presented to support defendant's assertion (now, for the first time) that Cook was acting as an agent for the police. The evidence establishes that Cook was at the time in jail on burglary and conspiracy charges. The police were not informed by Cook of defendant's statement until three days after the statement was made and after he had been released and then picked up again when information was received that he was wanted in other states. Cook indicated he told the officers about the statement thinking that they might give him a break. Since the record shows that defendant made the statment to a private citizen, with no police activity being involved, *Miranda* has no application and the evidence of the statement was properly admitted.

■ Defendant complains that the prosecutor exceeded the scope of permissible cross-examination when he asked him why he waited until the trial to tell his story about the "third man" who got into the car with the victim after they left the plant parking lot. Defendant placed his credibility as a witness in issue when he took the witness stand. The story about the third man came, to coin a phrase, "out of left field." It was only natural for the prosecution to question him about it. In any event, defendant raised no objection to the alluded-to cross-examination at the trial and is therefore precluded from urging the point now for the first time.

■ Lastly, defendant contends that the prosecution secured a "death oriented" jury, in violation of *Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], which must have been biased in favor of the prosecution in the guilt phase of the trial. Since defendant received a life sentence rather than the death penalty from the jury about which he complains, it is unnecessary to consider whether there was a *Witherspoon* violation in its selection. "The contention that a jury from which veniremen irrevocably opposed to the death penalty have been excluded 'cannot

answer guilt-innocence questions as favorably to the defendant' was rejected in *People* v. *Nicolaus,* 65 Cal.2d 866, 882 [15] [56 Cal.Rptr. 635, 423 P.2d 787]." (*People* v. *Beivelman,* 70 Cal.2d 60, 80 [73 Cal.Rptr. 521, 447 P.2d 913].)

The judgment is affirmed.

Kingsley, J., and Dunn, J., concurred.