Dan Don GONZALES, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–15247.

Court of Criminal Appeals of Oklahoma.

March 4, 1970.

Rehearing Denied Oct. 2, 1970.

Jay Dalton, Public Defender, for plaintiff in error.

Dan Don Gonzales, pro se.

G. T. Blankenship, Atty. Gen., Hugh H. Collum, Max A. Martin, Asst. Attys. Gen., for defendant in error.

BUSSEY, Judge.

Dan Don Gonzales, hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Tulsa County with the crime of Robbery with Firearms

After Former Conviction of a Felony. The information more specifically alleged that the defendant, on February 22, 1968, in said county, did unlawfully, feloniously, and wrongfully, while acting in concert with Norman Wade Wilson a/k/a Norman Wayne Martin, rob one Helen Hisel by wrongfully taking and carrying away certain money and personal property of value belonging to Vern Red Bud Food Center, and in the possession of Helen Hisel, and in her immediate presence without her consent and against her will, said robbery being accomplished by assaulting Helen Hisel by menacing her with a revolver and by threatening to shoot her if she resisted, and thereby overcoming all resistance and putting her in fear of immediate and unlawful injury to her person. The jury assessed his punishment at fifty (50) years imprisonment in the state penitentiary, and he appeals.

The facts adduced on the trial reveal that the robbery occurred on the 22nd day of February, 1968, in Tulsa County, at the location of the Vern Red Bud Food Center, around 8:00 p. m. The robbers on that date in question committed an assault by firing a firearm into the arm of Mrs. Helen Hisel, who was managing the store at the time. The robbers entered the store, proceeded to threaten the individuals inside if they did not comply. Both robbers wore a woman's nylon hose over their faces but were identified by Mrs. Hisel and other individuals in the store on the date in question. The robbers took over five thousand dollars from the safe and cash registers, all of the money being $20.00 bills or less in denomination.

Around 9:00 or 10:00 a. m. on February 23, 1968, witness Allen Gene Cooper testified that defendant Gonzales called him relative to purchasing an automobile. They met and the car was purchased for $1,-800.00 which was paid in ten and twenty dollar bills, delivered in a paper sack similar to that in which the money was taken from the robbery. This witness identified Gonzales and co-defendant Wilson as being the purchasers of the automobile and stated that Gonzales, whom he had known previously, had introduced Wilson as David Howard and that the title of the car was made to them jointly.

Detective Joe Thomas of the Wichita, Kansas, police department, testified that he saw the defendant and co-defendant Wilson in Wichita, Kansas, on February 24, 1968; that Gonzales identified himself as Allen Lee Johnson and Wilson gave the name of John Lee Blue.

The defendants did not take the stand in their own behalf and had only one witness, a Mr. Don LaGrone, a claims agent, as their sole and singular witness; his testimony only being that he had shown some photographs of the defendants to persons who were present at the scene of the robbery. The defendants did not offer a theory of defense, but rested after Mr. La-Grone left the witness stand.

On appeal counsel for defendant raises two assignments of error which are (1) Error of the court in giving instructions excepted to by the defendant and (2) That the court erred in giving Instruction No. 6 regarding flight. In addition to these assignments of error, the defendant has transmitted a pro se supplemental brief in which he urges that the courtroom identifications were so tainted as to be inadmissible for the reason that while he and co-defendant were in custody in Wichita, Kansas, the victim and witnesses to the robbery were shown photographs of the two defendants and that no attorney was present representing the defendants when the photographs were viewed by the witnesses. He urges that this violates his constitutional rights under the following authorities: Simmons et al. v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247; People v. Caruso, 68 Cal.2d 183, 65 Cal.Rptr. 336, 436 P.2d 336; United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; Chandler v. State, Okl.Cr., 461 P.2d 983; Illinois v. Nelson, 40 Ill.2d 146, 238 N.E.2d 378; and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 199.

■ We will first consider the pro se allegation of the defendant concerning the

courtroom identification. Although the admissibility of the courtroom identification is not before us since it was not raised in the trial court and was raised for the first time on appeal, in order to finally dispose of this contention, we will deal with it briefly in this opinion. The following references relative to the defendant and the co-defendant appear in the record:

At page 93 of the case made, Gary Gaff testified on cross-examination as follows:

"Q. (By Mr. Dyer) Have you ever been shown a group of pictures by anyone and asked to try to pick someone out of that group of pictures?

A. Yes, sir.

Q. And who showed you these pictures?

A. Someone up at the police station.

Q. Someone?

A. The same officer that took my oral report.

\* \* \* \* \* \*

Q. But some officer showed you a group of pictures, do you recall how many pictures were shown to you?

A. It was over 200.

Q. Over 200. Were they bound or were they loose? Were they in a bound book?

A. Yes, sir.

Q. All right. Were you able to identify anyone in that book or in those 200 pictures as one of the two defendants you have identified here today?

A. No, sir.

\* \* \* \* \* \*

Q. All right, sir. And that is the only occasion you have ever been shown pictures or a group of pictures and asked to identify someone from them?

A. Yes, sir."

At page 116 of the case made on cross-examination of Mike Campbell, we find the following:

"Q. Were you on that night shown a group of pictures and asked to pick the persons from those pictures?

A. I seen about three pictures which none of them I identified.

\* \* \* \* \* \*

Q. And there was only three?

A. Yes.

Q. Were the subjects shown to you ever identified to you? Did the police officer tell you who they were?

A. No, sir.

Q. Were you later shown additional pictures?

A. Yes.

\* \* \* \* \* \*

Q. How many pictures were shown to you on that date?

A. Two.

Q. And whom were they shown to you by?

A. Insurance man.

Q. And were you able to identify those?

A. No."

Helen Hisel, the victim, on cross-examination, at page 174 of the case made, testified as follows:

"Q. Mrs. Hisel, have you ever been shown pictures by anyone and asked if you could identify them?

A. Oh, yes.

Q. And were you shown pictures on the night of February 22nd?

A. Yes.

Q. And who showed those pictures to you?

A. The detective division, Savage, Detective Savage was one of them and the other detectives.

\* \* \* \* \* \*

Q. Did you pick anybody from those pictures that night?

A. Yes, I did.

Q. Okay. Were other employees of your store shown pictures that night?

A. Yes, they were.

Q. All right. Did they identify anybody at that time?

A. I do not know.

Q. Were you shown pictures later at a later date by someone?

A. Yes, I was.

Q. And at that time were any of your employees with you?

A. No, they were not."

On direct examination at page 142 of the case made, Mrs. Hisel testified as follows:

"Q. Thank you. Is there anything particular about portraiture and portrait drawing that could cause an individual such as you to notice another person's facial features?

A. Yes, sir.

Q. What, please, ma'am?

A. Lines and bone structure.

Q. And did you have occasion as a result of your experience at doing portrait drawing to pay any particular attention to the lines and bone structure of the man who came into your office armed with a gun?

A. I did."

Nancy Newman testified at page 229 of the case made on cross-examination:

"Q. All right. Were you ever shown pictures to identify one of the suspects at any time?

A. Yes, sir.

Q. And when was this?

A. A few days following.

Q. And did you identify anyone from those pictures?

A. Yes.

Q. A few days later. Were you shown any pictures in August by anyone?

*     *     *     *     *     *

Q. Subsequent to this robbery did any man show you two pictures and ask you to identify them, if you could identify the people in those two pictures?

A. Yes.

Q. And could you make an identification from those two pictures?

A. Yes."

Mrs. Newman further testified at page 235 on cross-examination:

"Q. His build and his coloring, but you are willing to swear upon oath as the prosecutor asked you, that that is the very same man that was there that night?

A. Yes.

Q. Just because of his build and his coloring?

A. Yes."

Again, at page 238 of the case made on cross-examination, Mrs. Newman testified:

"Q. To the identity of the man that was inside the booth with you and Mrs. Hisel, is your identification based here today on his facial features or just his general build and coloring?

A. Well, I could see him closer, yes, but his coloring and the size has a lot to do with it."

Lorene Craig testified at page 267 of the case made on cross-examination:

"Q. Were you or have you ever been shown pictures and asked to see if you could pick anyone out of those pictures?

A. At one time.

*     *     *     *     *     *

Q. Was he a policeman, if you know?

A. No, sir, I don't know.

Q. How many pictures did he show you?

A. Several.

Q. Were they loose?

A. Yeah, just loose pictures.

Q. Did they have any writing on them?

A. No, sir.

Q. Did he tell you there was someone in there you were supposed to pick out?

A. No.

Q. Were you able to pick out anyone from those pictures?

A. That little boy." [referring to the defendant Gonzales].

On redirect, at page 270 of the case made, Mrs. Craig testified:

"Q. Mrs. Craig, would you recognize the name of the man who showed you those photographs if you heard it?

A. Yes, sir.

Q. Was it Don LaGrone?

A. Yes, sir.

\*　\*　\*　\*　\*　\*

Q. Mrs. Craig, is your identification of this man in court today based on what you saw on the night of February 22nd, alone?

A. It's—I'm telling you the truth, it honest to God is the truth.

Q. Yes, ma'am. The fact that you may or may not have looked at pictures makes no difference, does it?

A. Makes no difference."

Mr. Jerry Harris testified on cross-examination at page 286, as follows:

"Q. Yes. Have you ever been shown any pictures to identify?

A. Yes, sir, I have.

Q. And when was this?

A. I don't know the day.

Q. Was this done by Mr. LaGrone?

A. Yes, it was.

Q. And did you positively identify anyone from these pictures?

A. Yes, I did."

On re-direct, Mr. Harris testified at page 297:

"Q. I will ask you, sir, if your identification in this courtroom today is based upon what you saw and observed on the night of February 22, 1968?

A. Yes, sir."

On re-direct, he testified at page 300:

"Q. Mr. Harris, one other question: Is it possible for you to make a more certain identification from viewing an individual in person, rather than looking at a one dimensional picture?

A. Yes, sir."

In the opening statement of the attorney for defendant Wilson, beginning at page 306 of the case made, we find the following:

"Ladies and gentlemen of the jury, on behalf of the defendant Wilson, we will call but one witness and this is the witness you have heard alluded to many times during the course of this trial and that is Mr. Don LaGrone, who was the insurance adjuster in this case and who we have asked certain witnesses if they were shown pictures of the defendants and whether or not they could make an identification. His testimony will be that on or about March 27th, this last year, or this year, he saw Marilyn Hix and showed her two pictures of each of the defendants and she could not make a positive identification of either. He showed Nancy Newman these pictures and she could not be positive. He showed Mike Campbell pictures, he could not make a positive identification. He showed the pictures to Gary Gaff and he said he could make a positive identification of the person who robbed the cash register. He showed pictures to Mrs. Hisel and she said she could make a positive identification of the person who robbed the inner office. He showed the pictures to Loren Craig and she said she could make a positive identification of the person who robbed the cash register. He showed the pictures to Jerry Harris and he could not be sure of either one, positive identification.

Of course, this evidence is brought to show how tenuous the identifications have been of the defendants in this case and I think after the evidence has been presented you will be able to determine from Mr. LaGrone's testimony and from observing the witnesses, how certain they were with stockings placed over—\* \* \* All right. You can make your own determination from here."

Mr. Don LaGrone testified at page 311:

"Q. Two photographs. Did you show these photographs to anyone?

A. Oh, just to these people.

Q. These people. All right. And what did you tell these people pursuant to showing them these photographs?

A. Nothing. I just handed them the photographs and asked if they could identify these—if they had ever seen these two men."

In Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, FBI agents obtained and (without indicating the progress of the investigation or suggesting who the bank robbery suspects were) showed separately to each of the five bank employees who had witnessed the robbery the day before some group photographs including petitioner and another (Andrews), both of whom were subsequently indicted for the crime. Each identified petitioner as one of the robbers; none identified Andrews. At trial, none of the photographs were introduced, but each of the five eyewitnesses swore that petitioner was one of the robbers.

■ Noting that "despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs," and that "the danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error," the Court ruled, per Harlan, J.:

"We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. * * *"

■ In the instant case counsel for both defendants raised the issue for the jury's consideration on cross-examination of the various witnesses and from a detailed ex-amination of the testimony quoted above, we find nothing to support the conclusion that the procedure employed in showing the photographs of the defendants was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification; but to the contrary, we are of the opinion that the evidence affirmatively discloses that the courtroom identifications of the defendants were made as a result of observations by the witnesses on the night of the robbery rather than on the basis of the photographs shown to them at a later date. We are accordingly of the opinion that this assignment of error is without merit.

This leads us to a consideration of the defendant's assignment of error that the trial court erred in giving Instruction No. 6 regarding Flight. Instruction No. 6 reads as follows:

"You are instructed that evidence has been offered tending to show flight by the defendant shortly after the commission of the crime alleged against them in the information. If you find from the evidence that the defendant did at some time flee from the place of the commission of such alleged crime, and that such flight was induced by their apprehension of being charged with a public offense by reason thereof, this is a circumstance to be considered by you, in connection with all other evidence, to aid you in determining the question of their guilt or innocence."

Defendant took exception to this instruction and apparently objects to the use of the word "tending" in the instruction, and to the absence of any mention of reasonable doubt in the instruction. In support of these contentions defendant cites Denney v. State, Okl.Cr., 346 P.2d 359, Wilson v. State, 96 Okl.Cr. 137, 250 P.2d 72 and Bruner v. State, Okl.Cr., 238 P. 1000.

■ In Ward v. State, Okl.Cr., 444 P.2d 255, the trial court had given an instruction which was identical to the in-

struction given in this case except for the fact that there was only one defendant in that case. The defendant objected to the instruction on the ground that it failed to define flight, and that the instruction invaded the province of the jury when it used the word "tending." In that case this Court took note of Wilson v. State, supra, and Denney v. State, supra, and answered the first contention as follows:

"* * * the failure to define 'flight' does not, under these circumstances, and standing alone, constitute reversible error."

In answering the second contention this Court said:

"We believe also that when the instruction is considered in its entirety, it properly places the question of fact before the jury, * * *."

In the case at bar, as in Ward v. State, supra, there was considerable uncontroverted evidence that the defendants did flee from the scene (CM 58, 60, 80, 109, 225, 243–249, 262, 282, 283).

■ The defendant's further contention that the instruction is erroneous because it does not mention reasonable doubt, is likewise without merit. The jury was instructed that they were to consider the instructions as a whole and not a part to the exclusion of the rest (CM 386). In Brewer v. State, 84 Okl.Cr. 235, 180 P.2d 848, this Court said:

"In the trial of a criminal case, it is not necessary for the court to repeat over and over, in every instruction, that each issue must be established beyond a reasonable doubt, where from the instructions as a whole it is made clear that every issue must be so established."

For the reasons above set forth, we are of the opinion that this assignment of error is without merit.

We shall lastly consider defendant's assignment of error that the trial court erred in giving Instruction No. 12 relative to good time credits under the authority of 57 O.S. § 138, in the second stage of the two-stage proceeding, which instruction was excepted to.

■ We feel it is only necessary to reiterate our holding in Williams v. State, Okl.Cr., 461 P.2d 997, wherein we held:

"1. It is error for the trial court to instruct the jury on time credits as provided in 57 O.S.Supp.1968, § 138, but where the instruction is given after a determination of the defendant's guilt, it does not constitute reversible error.

2. Where it appears that the giving of an erroneous instruction, together with other errors not requiring reversal, may have caused the jury to impose a greater sentence, in the interest of justice the judgment and sentence will be modified and as so modified, affirmed."

In this same case, on Petition for Rehearing, we declared this statute to be an unconstitutional encroachment by the Legislature upon the Judicial powers of the State.

■ In accordance with Williams v. State, supra, the judgment and sentence is modified from a term of Fifty (50) years imprisonment to a term of Forty (40) years imprisonment in the state penitentiary, and as so modified, the judgment and sentence is affirmed.

BRETT, P. J., concurs.

NIX, J., not participating.