Jesse **DANIELS**, Appellant,

v.

The **STATE** of Oklahoma, Appellee.

No. F–74–649.

Court of Criminal Appeals of Oklahoma.

March 13, 1975.

Rehearing Denied April 2, 1975.

Henry W. Floyd, Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., Bill James, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Jesse Daniels, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Logan County, Case No. CRF–74–5, for the offense of Robbery With Firearms, in violation of 21 O.S., § 801. His punishment was fixed at a term of twelve (12) years in the State Penitentiary and a timely appeal has been perfected to this Court.

At the trial William Clay testified he was employed at the U-Totem Food Store located at 1400 N. Wentz in Guthrie, Oklahoma, on September 30, 1973 as manager of the store. At approximately 7:10 a. m.,

shortly after opening the store, he was robbed of approximately $1,061 in cash and checks. The robber took Clay to the back of the store and locked him in the restroom telling Clay, "Don't come out for five minutes or I'll kill you." (Tr. 30) Clay then identified the defendant as the person who robbed him. He further identified State's Exhibit No. 1 as the gun he believed the defendant used to rob him.

Albert Hasler testified he was employed as a Lieutenant Detective for the Guthrie Police Department on September 30, 1973. He investigated the robbery of the U-Totem Food Store and was given, by Mr. Clay, a description of the robber and the gun used in the robbery.

Eli Mooney testified that on the morning of September 30, 1973, he went to the U-Totem store located at 1400 N. Wentz in Guthrie, Oklahoma. Upon entering the store and finding no one there, he called into the back of the store. He heard a door rattle and Clay thereafter came from the back of the store.

Don Roach testified he was employed by the Guthrie Police Department. In January of 1974 he received an arrest warrant for the defendant. He went to the Midwest City Police Department where two Midwest City Police Officers were assigned to assist him in making the arrest, and he arrested the defendant at his residence in Midwest City, Oklahoma. Officer Roach then identified State's Exhibit No. 1 as the gun that was taken from the defendant at the time of the arrest. State's Exhibit No. 1 was then admitted into evidence.

Russell Dean Wright testified for the defendant. He stated that he was a supervisor for the U–Totem Food Stores and was in charge of the store managed by Mr. Clay on September 30, 1973. He further testified that Mr. Clay's employment was terminated due to inventory shortages. However, on cross-examination Mr. Wright stated that 50% of his stores were having inventory shortages.

Clarence Suggs next testified for the defendant. He testified he was stationed at Tinker Air Force Base and was a friend of the defendant. During the first week of December, 1973, he took the defendant to Earl's Pawn Shop located in Midwest City, Oklahoma. The defendant purchased a .22 caliber pistol from the pawn shop at that time. He testified State's Exhibit No. 1 looked like the same gun.

Earl Mhoon, owner of Earl's Pawn Shop located in Midwest City, Oklahoma, testified his records revealed that he sold State's Exhibit No. 1 to the defendant on December 3, 1973. He testified that he had purchased the gun from one Randall Pulley on August 9, 1973.

Jesse Daniels, Sr., defendant's father, testified he was a minister, that he lived at Duncan, Oklahoma and had churches at Temple and Purcell, Oklahoma. He stated that on September 30, 1973, the day of the robbery, he went to the defendant's apartment in Midwest City, Oklahoma, arriving around 7:00 a. m. and staying there until approximately 10:00 or 11:00 that night. Mr. Daniels testified further that the only time the defendant left the apartment that day was with him for a short ride to Nichols Hills in Oklahoma City at approximately 4:00 or 5:00 p. m.

The defendant took the stand and testified that he was a Sergeant in the United States Air Force and was stationed at Tinker Field. He had served in the Air Force for approximately six years and eight months. He purchased State's Exhibit No. 1 at Earl's Pawn Shop the first part of December, 1973. He further testified that after his arrest Officer Roach told him that if he would agree to pay William Clay $1,200.00 through him (Roach) he would get the whole thing dropped. The defendant refused stating, "I didn't see why I should pay him anything. . . . I didn't do it so it's going to be up to you to prove I did and I know I didn't." (Tr. 122)

Officer Don Roach was called by the State in rebuttal. Officer Roach testified that there was never an offer to make a deal as the defendant testified. He further testified he could not have advised the defendant that if he would pay $1,200.00 to William Clay the charges would be dropped because he did not know how much money had been taken.

■ Defendant's first proposition asserts that he was the victim of an illegal search and seizure. The defendant complains under this proposition that a certain picture of himself was unlawfully seized from him and used in a pictorial lineup. The record reveals that from both Officer Roach's testimony and the defendant's testimony the picture of the defendant was given to Officer Roach voluntarily by the defendant. Officer Roach testified as follows:

"Q. Had you been to his apartment before?

"A. Yes, sir.

"Q. When was that?

"A. Oh, it was about, probably about a week, I'd guess, before the arrest warrant was issued.

"Q. And at that time, what did you discuss with him?

"A. Well, I told him that, who I was, and why I was there. I told him that he did not have to talk to me. I told him that if he did that anything he said could be used against him in a court of law, I explained to him that he was a suspect in an armed robbery and that if the evidence showed that he was the right person and it did indicate in that direction, that we would be back with a warrant anyway.

"Q. Did you ask him at that time for a photograph of himself?

"A. Yes, sir, I did.

"Q. Did he give it to you?

"A. Yes, sir.

"Q. Was it a full size picture or head and shoulders or what?

"A. It was a small photograph, just kind of a body type." (Tr. 71)

The defendant testified:

"Q. And what did he tell you at that time?

"A. Well, he came and told me that he was investigating a robbery that happened here in Guthrie and he told me that I was a suspect and so I asked him, 'Why?' but he wouldn't tell me anything. So he asked me did I have a picture or anything that he could take back and I told him I was quite sure I did, so I went in and I found a picture and brought it back to him and gave it to him and he said, 'Well, that's just about all now.' And I offered him my telephone number and where I worked out at Tinker in case I wasn't at home that he could get in contact with me if he needed to." (Tr. 117)

Therefore, we find this proposition to be without merit.

■ Defendant's second proposition asserts the verdict was not supported by the evidence. Although there is a sharp conflict in the evidence and different inferences may be drawn therefrom it is not this Court's duty to sit as jurors and this Court will not substitute its judgment for that of the jury, since it is the exclusive province of the jury to weigh the evidence and determine the facts. See, Jones v. State, Okl.Cr., 468 P.2d 805 (1970) and Coats v. State, 90 Okl.Cr. 217, 212 P.2d 141, 214 P.2d 455 (1949). In the instant case the jury apparently chose to disbelieve the defendant's evidence and instead chose to believe the State's evidence. It is our opinion that there was competent evidence in the record from which the jury could reasonably conclude that the defendant was guilty as charged. We therefore find this proposition to be without merit.

■ Defendant's final proposition asserts error of the trial court in not granting him a new trial. Defendant first contends under this proposition that he was prejudiced by reason of a juror stating to

another juror that she was being excused the next day because, "they were going to try the man who robbed her son." First we observe that neither of the two jurors served on the defendant's jury. Further, the record is completely void of any competent evidence to support the defendant's contention that this conversation actually took place. We therefore find this allegation to be without merit. See, Townley v. State, Okl.Cr., 355 P.2d 420 (1960).

█ Next under this proposition, the defendant alleges the trial court erred in admitting evidence of a tainted identification by witness Clay. The record is completely void of any objection to the identification of defendant by witness Clay nor does the record reveal that the defendant at any time prior to, or during the course of the trial, requested an evidentiary hearing. Absent an objection and a timely request for an evidentiary hearing, we are of the opinion that this proposition is improperly before this Court. See, Anthamatten v. State, Okl.Cr., 506 P.2d 959 (1973), Bridgeman v. State, Okl.Cr., 496 P.2d 431 (1972) and Gonzales v. State, Okl.Cr., 480 P.2d 930 (1970).

Finding no error sufficient to warrant reversal or modification, it is our opinion that the judgment and sentence appealed from should be, and the same hereby is, affirmed.

BLISS, J., concurs.

BRETT, P. J., dissents.

BRETT, Presiding Judge (dissenting).

Having reviewed the record of the proceedings below, I find that I must dissent to this decision.

While I cannot disagree with the Court's familiar statement that, "it is not this Court's duty to sit as jurors and this Court will not substitute its judgment for that of the jury, since it is the exclusive province of the jury to weigh the evidence and determine the facts," I fear that its easy repetition wholly ignores the distinction between appellate determination of an issue of fact, and appellate review of evidence for the purpose of determining an issue of law.[1] *An error of law* is committed when, on motion for new trial, the trial judge refuses to set aside a verdict which is contrary to the evidence. As a fundamental principle in the criminal law, and by express statute, unless the proof establishes guilt beyond a reasonable doubt, the accused in the trial of a criminal case is entitled to an acquittal as an absolute right. 22 O.S.1971, § 836. Also, by express statute the trial court may, if it deems the evidence presented insufficient to warrant a conviction, advise the jury to acquit the defendant. However, by the terms of that statute the jury are not bound by that advice nor can the court for any reason prevent the jury from giving a verdict. 22 O.S.1971, § 850. However, our statutory scheme provides that a new trial shall be granted, "when the verdict is contrary to the law or the evidence." 22 O.S.1971, § 952. Of this statute we have stated:

> "Under this provision, the responsibility of determining whether or not there has been adduced before the jury a sufficient amount of legal and competent evidence to render it safe to allow the verdict to stand is imposed upon the trial court in the first instance, *and on appeal upon this court.*" Matheny v. State, 37 Okl.Cr. 369, 259 P. 175, 176 (1927). [emphasis supplied]

See also, James v. State, 48 Okl.Cr. 48, 289 P. 780 (1930); Black v. City of Pawhuska, 47 Okl.Cr. 23, 287 P. 737 (1930); White v. State, 13 Okl.Cr. 76, 162 P. 232 (1917).

In Matheny v. State, supra, this Court said further:

> "The performance of this duty on the part of the court is the exercise of legal discretion in judgment as to the sufficiency of the evidence to overcome the legal presumption of innocence to which every one is entitled who is put upon trial for an offense." 259 P. at 176.

1. See, Orfield, Criminal Appeals in America, pages 80–91 (1931).

In the instant case, to prove its charge, the State relied almost entirely upon the testimony of the prosecuting witness, William Clay. By coincidence William Clay's mother was a member of the jury panel from which the jury was selected to try this case. Indeed, it appears that Mrs. Clay's name was called while defendant's jury was being empaneled, but that the judge stopped her as she approached the jury box, inquired if she was related to the prosecution witness, William Clay, and upon being told that she was Clay's mother, the judge dismissed her. (Tr. 175) The credibility of the witness Clay was more than ordinarily impaired by the testimony which followed his. On direct examination, Mr. Clay testified that the robber, "took me out of the storeroom and locked me in the restroom . . . . " (Tr. 30) On cross-examination he admitted that there was no lock on the outside of that door, and that it was possible to lock it only from the inside. Mr. Clay testified that immediately following the robbery a customer came into the store and he, Mr. Clay, ran from the restroom toward the front door and heard a car speeding away at great speed. That customer, Mr. Eli Mooney, testified for the State that as he approached the grocery store on foot he observed an automobile driving away, but it was his testimony that the car departed in a leisurely fashion and that there was nothing whatsoever unusual about the manner in which it was being driven. (Tr. 58; 60) Mr. Clay testified that the store had installed a double safe system designed to prevent robbers from escaping with large amounts of cash. He stated that this system was designed so that the bulk of the cash on hand could be put into a section of the safe which he, the store manager, was unable to open alone. He testified, however, that his supervisor had instructed him not to use that safety feature. (Tr. 42) That supervisor, Mr. Dean Wright, testified that he had given no such instruction to Mr. Clay. Mr. Wright also testified that the services of Mr. Clay as store manager had been terminated shortly after the robbery for the reason that the monthly inventory taken of the store continued to disclose serious shortages. (Tr. 80–83) Perhaps most significantly, Mr. Clay testified that he was able to positively identify the weapon introduced by the State as the .22 caliber pistol which had been used in the robbery. He stated that he was able to make that identification because the barrel was marred near the end. (Tr. 36) Police Officer Roach, testifying for the State, stated that he had caused the scratch on the barrel of the gun by putting it in his pocket with another gun at the time he seized it. (Tr. 65) The defendant called as his witness the owner of the pawn shop from which he had purchased the gun introduced into evidence by the State. That witness, Mr. Earl Mhoon, identified the gun in question by its serial number. He testified that records which he was required to keep by the Federal Government showed that the gun in question was acquired by the pawn shop on August 9, 1973, that it was not redeemed, and hence was put up for sale on October 10, 1973, and that it was sold to the defendant, Jesse Daniels, on December 3, 1973. The robbery, it will be remembered, occurred on September 30, 1973. Since the jury's verdict of guilt is based entirely upon the testimony of the prosecuting witness, William Clay, and since that testimony was impeached and contradicted in almost every particular, I cannot close my eyes to the significance of the fact that this witness' mother was a member of the jury panel and indeed was called to sit upon this petit jury before being dismissed by the court.

Without further summarizing the evidence, it is sufficient to say that I find the verdict so clearly and flagrantly against the weight of the evidence that I must conclude that it was the result of passion and prejudice. I would therefore reverse the judgment and sentence appealed from and remand this case for a new trial.