**Charles Edward HICKS, Appellant,**

**v.**

**The STATE of Oklahoma, Appellee.**

**No. F–77–792.**

Court of Criminal Appeals of Oklahoma.

Aug. 23, 1978.

Stephen G. Coit, James R. Wright, Jr., Clinton, for appellant.

Larry Derryberry, Atty. Gen., Bill J. Bruce, Asst. Atty. Gen., Carol Elaine Alexander, Legal Intern., for appellee.

## OPINION

BUSSEY, Presiding Judge:

Appellant, Charles Edward Hicks, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Custer County, Case No. CRF–77–13, of the offense of Rape in the First Degree, in violation of 21 O.S.1971, § 1114. His punishment was fixed at five (5) years' imprisonment, and from said judgment and sentence a timely appeal has been perfected to this Court.

At the trial, Officer Jim Free testified that on the morning of February 3, 1977, he was dispatched to the University Apartments in Weatherford, Oklahoma. He had a conversation with T. K. and subsequently accompanied her and her husband to the hospital. He identified State's Exhibit No. 1 as an iron which he obtained from T. K.'s apartment on the day in question.

Linda Barker testified that she lived in the apartment one floor up from the prosecutrix. On the morning of February 3, 1977, she heard loud noises coming from T. K.'s apartment. Approximately ten minutes later, she heard screaming and the sound of objects being knocked over in T. K.'s apartment.

Dr. Eugene Hale testified that he examined the prosecutrix at the Weatherford Hospital on the morning of February 3, 1977. She had a contusion-laceration of her lip. He performed a pelvic examination and obtained a sample of a cloudy fluid from the vagina. This fluid was placed into a vial which was given to Mrs. Day, Director of Nursing Services at the hospital, who gave the vial immediately to Deputy Sheriff Roy Ezzell.

Deputy Sheriff Roy Ezzell testified that on February 3, 1977, he received certain materials from Mrs. Day, including a vial containing a liquid. He placed the materials into a sealed envelope and transported them to the Oklahoma State Bureau of Investigation Laboratory.

Officer Charles Day of the Clinton Police Department testified that on February 3, 1977, he was specially assigned to assist in an investigation in Weatherford. He interviewed the prosecutrix and took photographs of the inside of her apartment.

Paula Day testified that she was employed as the Director of Nursing Services at the Weatherford Hospital. She received a vial containing a fluid obtained from vaginal washings of the prosecutrix. The vial was labeled, sealed and turned over to Deputy Sheriff Roy Ezzell.

Janice M. Davis testified that she was employed as a forensic chemist with the Oklahoma State Bureau of Investigation. She identified State's Exhibit No. 4 as an evidence envelope which she received on February 3, 1977, from Deputy Ezzell. She conducted an examination of the fluid contained in the vial and determined that it contained intact sperm.

The prosecutrix testified that on February 3, 1977, she and her husband lived at 105 West University in Weatherford. She attended a class and returned home at approximately 9:00 a. m. She made some hot chocolate and began typing an assignment. The doorbell rang and she looked out through the peephole in the door. She saw a tall black man whom she thought was a

neighbor, so she opened the door. When she opened the door she discovered that the man was not her neighbor. The man asked her if she knew where "Jimmy" lived, and she replied that she did not know. The man then barged into the apartment, and she began screaming. He grabbed her around the neck and picked up an iron and threatened to kill her if she did not stop screaming. He told her he wanted money and she gave him seven dollars. The man, whom she identified in court as the defendant, stated that he knew she had more money and pushed her into the bedroom. He put the iron up to her face and ordered her to remove her clothing. He grabbed her around the neck and forced her down onto the bed. He dropped his pants and raped her. The prosecutrix testified that the defendant was in her apartment for approximately 30 minutes. He was wearing blue pants, a blue windbreaker and had on a gray stocking cap.

On cross-examination she testified that she was shown two photographic lineups and a group picture of the Southwestern State University basketball team.

Officer Merle Bonner testified that he arrested the defendant on the afternoon of February 3, 1977. The defendant was wearing blue jeans, a blue coat and a white hat.

The defendant testified that he was attending Southwestern State University on a basketball scholarship. On February 3, 1977, he was in his apartment on the campus until 11:00 a. m. He then went to Oklahoma City with a friend, Jimmy Calib, and stayed until that evening. He denied being in the prosecutrix' apartment or having intercourse with her.

■ Defendant contends in his first assignment of error that the trial court erred in admitting the prosecutrix' in court identification of the defendant in that the pretrial identification procedures were so necessarily suggestive and conducive to irreparable mistaken identification amounting to a denial of due process. We must disagree.

The evidence established that the offense occurred on February 3, 1977, between approximately 9:30 and 10:00 a. m. Officer Free arrived at the prosecutrix' apartment at approximately 10:07 a. m. He received a description of the assailant from the prosecutrix as being a black male approximately 6'2", wearing a blue jacket and a gray ski mask. The prosecutrix was shown a photograph tray containing approximately 60 photographs of black males at 1:00 p. m. at which time she identified the defendant. The prosecutrix further identified the defendant later that day from a photograph of the Southwestern State basketball team and from another photographic display from the photograph tray. There was no evidence to indicate that any suggestion was made by the police officers to the prosecutrix as to whom she should identify. To the contrary, the evidence was uncontradicted that the officers merely advised her to "look carefully at each photograph in the tray, all of the photos in the tray, not to try to make any decision until she had looked at all of them and then [to] show [the officers] what she believed if the photo of her attacker were there." Because of the short time factors between the commission of the offense and the number of photographs shown to the prosecutrix and her unequivocal, unsolicited identification of the defendant at each display, we conclude that the preidentification procedure was not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. See, *Gonzales v. State*, Okl.Cr., 480 P.2d 930 (1970), and *Powell v. State*, Okl.Cr., 478 P.2d 923 (1970).

Defendant urges in his second assignment of error that the trial court erred in orally instructing the jury after the case had been submitted for determination and before the verdict had been returned.

The record reflects that after the jury had been deliberating approximately one and a half hours they returned to the courtroom at which time the following transpired:

"[THE COURT] Who is the foreman of the jury?

"MR. TAYLOR: I am.

"THE COURT: Do you have a report to make to the court? You told the bailiff that you had something you wanted to report to the court. You may state it.

"MR. TAYLOR: We don't have enough evidence—

"THE COURT: Now, wait a minute. That is not—just answer these questions. "Has the jury arrived at a verdict as yet?

"MR. TAYLOR: No, sir.

"THE COURT: And you have deliberated an hour-and-a-half?

"MR. TAYLOR: Yes, sir.

"THE COURT: And apparently you are indicating that you are having some difficulty in arriving at a verdict?

"MR. TAYLOR: Yes.

"THE COURT: That is fine, you may be seated. Now, ladies and gentlemen of the jury, we are here to try these cases and make decisions. That is what we are here for. Decisions are tough. We have to call them like we see them.

"You had the evidence. We opened court here and we gave the opportunity to both sides to being (sic) in whatever they had. They brought in their evidence, they presented it to you, and that is it. That is all the evidence there is. That is it.

"Now, I gave you instructions on what the law is. Definition of what the crime is. The burden of proof, instructions on that, what the State is required to prove. If the state proved it they are entitled to a verdict. If they failed to do it the law says they are not, and the defendant is entitled to a verdict of not guilty.

"That is what the law is. All the law and all of the rules are in the instructions. "Now, I know you probably think you have deliberated an awfully long time, and it has been tedious, and it has [been] long, but that isn't long. This is an important case, it needs due consideration of the evidence, and of the rules that you have for arriving at your verdict.

"And this case does need to be decided. It needs to be decided, and that is what you have to decide it on. I know it is tough. I have been in this business all the time and I have to decide cases all the time with what is presented to me.

"You have to take what you have got. You can't say 'Well, I wish you would get this and that.' You don't get any of that. You have to take what is given you and make a decision from that under the rules that we have. That is our system and that is the way it works, and that would be a fair trial.

"I know you think you have deliberated a long time and you are tired. We have had some jurors that deliberated 10, 12 or 24 hours and then brought in a verdict. So you have just been out an hour-and-a-half. So I think you should make every reasonable effort to work together to see if you cannot without sacrificing your individual conscience about the matter arrive at a verdict that is unanimous in disposing of and deciding this case. "O.K.?

"That is just the way it is, and I don't think I am on one side or the other. I am not, it is your responsibility from what you have heard and the evidence.

"Now, we will let you retire back to the jury room for further deliberation. If you would like to go to dinner—do you think we might as well arrange for you to go to dinner at 6:00 o'clock, or do you want to report back in a little while?

"MR. TAYLOR: We will deliberate a while.

"THE COURT: This case is resubmitted to the jury, and you may retire to the jury room to consider further your verdict in this case.

"You will retire to the jury room in charge of the Bailiff."

■ The defendant first argues that the foreman's statement that "we don't have enough evidence," was an informed verdict requiring the trial court to give a judgment of acquittal. We must again disagree.

Title 22 O.S.1971, § 920, provides in part as follows:

"If the jury persist in finding an informal verdict, from which, however, it can be clearly understood that their intention is

to find in favor of the defendant upon the issue, it must be entered in the terms in which it is found, and the court must give judgment of acquittal. . . ."

We are of the opinion that the remark by the jury foreman, which was cut off by the trial court, does not clearly indicate that the jury intended to find in favor of the defendant.

■ We would next observe that although this Court has looked with disfavor upon the giving of oral instructions, that the trial court's remarks in the instant case would fall within the exception to the general rule in that they did not materially alter the written instructions and had not the tendency to confuse the jury. See, *Baker v. State*, Okl.Cr., 378 P.2d 785 (1963) and *Claborn v. State*, Okl.Cr., 462 P.2d 312 (1969). We, therefore, find this assignment of error to be without merit.

■ For his third assignment of error, the defendant asserts that he was prejudiced because of a confrontation between the prosecutrix, her family and the jury while they were taking a dinner break during deliberations. We need only observe that the trial court conducted a hearing as to this issue and after hearing evidence of the bailiff and statements by the attorneys, the trial court found that there was not such a confrontation as to cause prejudice to the defendant. There was no conversation between the prosecutrix or her family and the jury but, rather, there was a chance meeting while both groups were leaving the courthouse for dinner. The mere observation of a complaining witness by a jury, standing alone, does not in itself constitute prejudicial error.

■ The defendant further urges under this assignment of error that he was prejudiced by the passage of a note between the judge and the jury. The record reflects that this issue was first orally presented to the trial court during defendant's motion for a new trial, wherein the following transpired:

"MR. WRIGHT: One thing I thought we might mention was the misdirection of the jury. We are including in that not only this incident when the jury came back after an hour-and-a-half and the Foreman announced there wasn't enough evidence, but also the passage of the note to the Judge, and I believe there was a note.

"MR. BRUNSON: That is not set out in the Motion, and we will object to that.

"THE COURT: That is in the file. We always put those in the file if there is a note.

"MR. WRIGHT: I saw the court write something down. I can't swear, but I think you handed it back to Walker and he took it back to the jury room.

"THE BAILIFF: He was asking you something and you wrote on there 'No more evidence' or something.

"THE COURT: I guess we better look at that note. It may be significant if it is in the file. I can't remember what it was or what happened.

"MR. WRIGHT: You were standing right at the end of the counter as you go around the counter, and Walker brought this to you, and I can't remember what you said. You said 'Nothing more' or something like that, and made some notation on it. We want to be sure that is included in the record.

"THE COURT: We need to find the note to see exactly what it says."

We would observe that the record does not support defendant's contention that there was a note or that if there was one that it was delivered to the jury. The statements by trial counsel indicated that he believed there was a note and that he thought "you handed it back to Walker and he took it to the jury room." Assuming arguendo that the judge did in fact write "nothing more" and that said message was delivered to the jury, it is inconceivable that the same could have resulted in prejudice to the defendant. See, 20 O.S.1971, § 3001.

■ For his final assignment of error, the defendant asserts that the trial court erred in not sustaining his motion to remove the real evidence not offered as evi-

dence by the State and to strike all testimony pertaining thereto. We are of the opinion that this assignment is wholly without merit. The record does not reflect that the defendant objected to the testimony as to the identification of the exhibits, but rather objected for the first time after the State inadvertently rested without offering the exhibits to be admitted into evidence. The items in question were a household iron, a photograph of the apartment, a blue jacket, and two seals.

The trial court properly overruled the defendant's motion to strike the testimony concerning the exhibits finding them to be only demonstrative exhibits not prejudicial to the defendant, and subsequently ordered the exhibits removed from the courtroom at the conclusion of the defendant's case in chief.

In conclusion, we observe that the record is free of any error which would cause reversal or justify modification. The judgment and sentence is, accordingly, *AFFIRMED.*

CORNISH, J., concurs in results.

BRETT, J., concurs.