Filed 1/15/15  In re Andrew A. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# COPY

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| In re ANDREW A. et al., Persons Coming Under the Juvenile Court Law. | C076974 |
| EL DORADO COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>ERIC A.,<br><br>        Defendant and Appellant. | (Super. Ct. Nos. SDP201243, SDP201244) |

Eric A., the father of 10-year-old Andrew A. and six-year-old Ashley A., appeals from orders of the juvenile court finding clear and convincing evidence that it is likely the children will be adopted and terminating parental rights.  (Welf. & Inst. Code, §§ 366.26, 395; unless otherwise stated, statutory references that follow are to the

1

Welfare and Institutions Code.)  As the given names of the children are among the 100 most popular birth names during the last 13 years, we will not designate them by initials as this impedes readability and results in confusion in legal research and record-keeping. (*In re Jennifer O.* (2010) 184 Cal.App.4th 539, 541, fn. 1; *In re Edward S.* (2009) 173 Cal.App.4th 387, 392, fn. 1; Cal. Rules of Court, rule 8.401(a)(2).)

On appeal, father contends the evidence was insufficient to support the finding that it is likely the children will be adopted.  We affirm the juvenile court's orders.

FACTS AND PROCEEDINGS

In August 2012 the El Dorado County Health and Human Services Agency (the Agency) received a report that the residence (trailer) father shared with the children was in poor condition and its natural gas connection had been turned off.  A home visit revealed that the trailer was noticeably dirtier than in prior visits, the children were sleeping on old mattresses with no bedding, and there was no natural gas for room or water heating.  Father acknowledged the home's deteriorated condition and said he was having emotional and financial difficulties.  Father requested that the children be placed in Child Protective Services custody.

*Petition*

In September 2012, petitions were filed alleging that father had asked the Agency to take custody of the children, that his home was filthy and not suitable for the children, and that father had psychiatric/emotional problems that precluded him from taking proper care of the children.  The petition later was amended to include allegations against B.D., the mother of the children, who is not a party to this appeal.

*Detention*

The parents submitted on the Agency's detention report and the children were detained in foster care.

2

*Jurisdiction and Disposition*

The Agency's report for the jurisdiction hearing reiterated the conditions that had led to the children's detention. The parents submitted the jurisdiction issue to the court on the basis of the report.

Two days later, father attempted suicide by setting fire to his bedroom. After surrendering to authorities, he was incarcerated on arson and vandalism charges.

The Agency's October 2012 disposition report recommended that father's reunification services be bypassed because they would be detrimental to the children in light of the arson and incarceration. (§ 361.5, subd. (e)(1).) Father submitted on the recommendation. He acknowledged that the likely results would be that his parental rights would be terminated, the children put up for adoption, and perhaps he would have no future relationship with them.

The disposition report recommended that mother's services be bypassed based on her failures to reunify with two other children and resistance of treatment for substance abuse. (§ 361.5, subds. (b)(10), (b)(13).) Mother provided argument on the issue of failure to reunify and submitted on the issue of resistance to treatment.

*Selection and Implementation*

At the time of the first selection and implementation hearing in January 2013, the children were ages eight and four. After hearing testimony from father, the juvenile court found by clear and convincing evidence that both children were adoptable. The court did not terminate parental rights for either child because it concluded severing father's relationship with Andrew would be detrimental to him, and severing parental rights for Ashley would cause substantial interference with the siblings' relationship. The court selected a permanent plan of legal guardianship for both children.

At a second selection and implementation hearing in August 2013, the juvenile court reiterated that guardianship was the permanent plan and issued letters of

guardianship for both children. The guardian was the foster mother with whom the children had resided since their removal from father's custody.

*Status Review*

A January 2014 status review report indicated that the guardian was having a "difficult time" with Ashley's enuresis, which she attributed to prior sexual trauma. A criminal investigation of the trauma had yielded no confession or physical evidence. Ashley was engaged in counseling in which she was "extremely verbal" and from which she "appear[ed] to be benefiting." But the guardian was unwilling to spend time with Ashley doing the required muscle exercises, stating she did not have the time; was uncomfortable being in the bathroom with Ashley; and the enuresis required psychological rather than physical therapy. The guardian was having a difficult time understanding how the enuresis was related to the prior sexual trauma.

A February 2014 addendum reiterated that Ashley's therapist had been working to educate the guardian about the enuresis as it related to trauma and "parenting from a trauma based perspective." The guardian had resisted the therapist's efforts, stating that she did not have the time. The guardian reported feeling overwhelmed and needing more breaks to regain her energy.

The status review report noted that Andrew was "very well-mannered" and "responsive" to his time with his counselor. Visiting with father was a common discussion topic. The report noted that, following a September 2013 incident in which Andrew had physically hurt another child, Andrew was involved in a November 2013 incident in which he argued with a friend and discussed why he was upset rather than yelling or becoming violent. Andrew was "extremely proud" of the manner in which he had handled the latter incident.

At the review hearing in February 2014, the juvenile court found that the manner in which the guardian responded to the enuresis was not appropriate.

*Supplemental Petition*

In March 2014, the Agency filed a supplemental petition alleging the guardian was unable to meet the children's long-term needs and selection of another caregiver was in their best interest. In April 2014, the guardianship was terminated.

*Selection and Implementation*

A May 2014 report for the third selection and implementation hearing noted that on March 1, 2014, the children had been placed together in a certified foster home. The Agency assessed Andrew and Ashley as adoptable. Andrew was successfully addressing his anger, grief, and loss in therapy. Ashley was revisiting the issue of therapeutic treatment for enuresis and would see a pediatric urologist. The children would attend conjoint therapy where Andrew could listen, support, and provide compassion to Ashley regarding the severe trauma she assertedly had received from father and another male. The children were in need of a permanent and stable home where they could develop and thrive. No prospective adoptive parents had been identified, but the social worker was awaiting responses from licensed adoption agencies to a "child available" notice the Agency had issued.

A contested hearing was held on June 4 and 5, 2014. Father testified that Andrew had "pretty much accepted the idea" that he would not be coming home to father. Father said they discussed the possibility of not having more visits if parental rights were terminated. Andrew "handled it pretty well. He's actually really mature for his age. He's been through a lot so."

On cross-examination by counsel for the Agency, and over his counsel's objection, father admitted that both of the children were adoptable. Father acknowledged that Andrew needed permanence, stability, and a good home; but father believed that both children needed to see him and mother on a regular basis. On cross-examination by

counsel for the children, father conceded that Andrew probably would allow someone other than father to fill a parental role.

Social worker Katie Zemel testified by offer of proof that she explained adoption and termination of parental rights to Andrew who affirmed that he wanted to be adopted but said he also wanted visits with the parents.

Social worker Pamela Utley testified that Andrew had asked his current foster parents to adopt him. Utley added that the foster mother was struggling with Andrew's behavior when he returns from therapeutic visits with father. Andrew is "in turmoil, upset, and speaks to [the foster mother] inappropriately after those therapeutic visits." She would have to assess Andrew's behavior following termination of parental rights before considering the issue of adoption.

Utley testified that her "child available" notice, which had drawn no responses, had reflected a "legal status" of "high risk" for prospective adoptive families in that a previous selection and implementation hearing had been held but parental rights had not been terminated. The "risk" was that "the prospective adoptive parents will enter into the pre-steps into adoption and then not have it finalized." Prospective parents will "feel at risk committing before the child is truly free for placement." The "high risk" label did not suggest that the children were not adoptable.

DISCUSSION

I

*Standard of Review*

Father contends the evidence was insufficient to prove that Andrew and Ashley are likely to be adopted within a reasonable time following the termination of parental rights.

When the sufficiency of the evidence to support a finding or order is challenged on appeal, even where the standard of proof in the trial court is clear and convincing, the

6

reviewing court must determine if there is any substantial evidence--that is, evidence which is reasonable, credible, and of solid value--to support the conclusion of the trier of fact. (*In re Angelia P.* (1981) 28 Cal.3d 908, 924; *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214.) In making this determination we recognize that all conflicts are to be resolved in favor of the prevailing party and that issues of fact and credibility are questions for the trier of fact. (*In re Jason L.*, at p. 1214; *In re Steve W.* (1990) 217 Cal.App.3d 10, 16.) The reviewing court may not reweigh the evidence when assessing the sufficiency of the evidence. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

"The juvenile court's judgment is presumed to be correct, and it is appellant's burden to affirmatively show error. [Citation.]" (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

II

*Adoptability*

"If the court determines, based on the assessment . . . and any other relevant evidence, by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption. The fact that the child is not yet placed in a preadoptive home nor with a relative or foster family who is prepared to adopt the child, shall not constitute a basis for the court to conclude that it is not likely the child will be adopted." (§ 366.26, subd. (c)(1).)

Determination of whether a child is likely to be adopted focuses first upon the characteristics of the child. (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) The existence or suitability of the prospective adoptive family, if any, is not relevant to this issue. (*Ibid.*; *In re Scott M.* (1993) 13 Cal.App.4th 839, 844.) "There must be convincing evidence of the likelihood that adoption will take place within a reasonable time." (*In re Brian P.* (2002) 99 Cal.App.4th 616, 625.)

### III

*Father's Contentions*

Father contends the adoptability evidence was not "clear and convincing," in that it was not "so clear as to leave no substantial doubt."  (Quoting *In re Jost* (1953) 117 Cal.App.2d 379, 383, reversed by *Jost v. United States* (1954) 347 U.S. 901 [98 L.Ed. 1061].)  But whether that was so was a question for the juvenile court; on appeal the issue is whether there is any substantial evidence to support the juvenile court's finding.  (*In re Angelia P., supra,* 28 Cal.3d at p. 924.)

Father does not set forth all the evidence supporting the adoptability finding or address why that entirety of evidence is insufficient.  (See *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)  Instead, father argues that the failed legal guardianship precluded a finding of adoptability because "the strain of caring for these two children proved to be too much for the legal guardian."

Even so, the guardian was also the guardian for two older wards who had experienced prior trauma and who did not want to share their now "comfortable" and "wonderful" lives with their "house guests," Andrew and Ashley.  The juvenile court could infer that the guardianship had failed, at least in part, due to the "strain" of this family dynamic that was not likely to be replicated in other prospective adoptive homes.

The juvenile court could further infer that the guardianship had failed in part because the guardian did not understand the cause of Ashley's enuresis or the nature of the needed therapy and was not comfortable assisting Ashley with the muscle exercises that could control her condition.  As a result of these failures, the enuresis persisted and further stressed the children's placement with the guardian.  The court could infer that, with proper treatment from an engaged caretaker, the condition could be treated and would not threaten a future placement.

8

Father notes that the social worker sent "child available" notices to at least a dozen adoption agencies, which was far more than she ordinarily sends, yet the notices drew no responses. But father overlooks evidence adduced at the hearing that the notices had reflected a "legal status" of "high risk" for prospective adoptive families in that a previous selection and implementation hearing had been held but parental rights had not been terminated. The "risk" was that "the prospective adoptive parents will enter into the pre-steps into adoption and then not have it finalized." Prospective parents would "feel at risk committing before the child is truly free for placement." The juvenile court could infer that, following termination of parental rights, the "child available" notices no longer would reflect a legal status of "high risk" for prospective adoptive parents.

Father reads the notices as somehow suggesting "*the children* were 'high risk.' " As the evidence made plain, it was the *prospective adoptive families* who were at risk of *the court* selecting and implementing a permanent plan other than adoption.

Father claims the adoptions assessments do not provide substantial evidence that the children are adoptable. Instead, he claims the reports are limited to a "barebones assertion that the minors 'are adoptable' " and "[a]ll that we have in this case is nothing but a barebones claim of adoptability." The relevant reports do not support this claim.

The selection and implementation report for the June 4, 2014, hearing stated that Andrew is "well-mannered, personable, a wonderful young man with blue eyes and brownish hair. He loves to play video games, riding bikes, playing tag, and basketball. Andrew's dream is to play in the NBA. On May 1, 2014, Andrew's foster mother reported that Andrew will be starting football in July 2014. Andrew is physically healthy and developmentally on target [chronologically] for his age, and he does not appear to suffer from any extraordinary behaviors or psychological issues." The report noted that Andrew is in the fourth grade; as of May 13, 2014, "Andrew did not have a discipline record, he had no absences, and just three tardies, which two were unexcused and one was excused. Andrew was proud and justifiably so regarding his recent grades, as out of

the five graded classes his Grade Point Average . . . was 88.14, plus in Science he completed 100% of his homework." The report noted that Andrew receives weekly therapy to regulate stress, anger, loss, and grief, and to maintain his current placement. Andrew told the adoptions worker that, if his parents' rights were terminated, he could participate as a healthy member of an adoptive family and follow the directives of those parents. The adoptions worker complemented Andrew on his maturity and insight.

The report described Ashley as "an adorable, blondish/brownish haired, six-year-old girl. She is charming, articulate, and loves painting and coloring. Overall, Ashley appears to be developmentally on target. Currently, Ashley is wearing diapers concerning her enuresis and will be seeing a pediatric urology specialist to rule out any medical issues regarding said. Ashley's enuresis could possibly be a medical issue and/or a psychological issue due to Ashley's substantiated referral regarding her sexual abuse. Although, Ashley has received a medical examination concerning her molestations, there has not been a urological examination that might reveal an internal issue not detected prior, as she reported being penetrated with an adult penis, an adult digit, and a beer bottle." The report noted that "Ashley does not exhibit any extraordinary behavioral issues. It is reported that she has tantrums, which appear to be age appropriate, especially with her history." The report noted that Ashley receives play therapy and will have conjoint therapy with Andrew regarding his doubting her reports of sexual abuse. Ashley was enjoying kindergarten and she had no disciplinary record, had been absent only twice, and had not been tardy to school. Ashley made a drawing of her "perfect family" that included her current foster sister, current foster mother, Andrew, and herself, within her current foster home.

Father relies on the juvenile court's February 28, 2014, remark that the children had "very extensive and well-documented behavioral problems." But the report suggests that the children's behavioral issues were not extraordinary and were being addressed at school and in therapy.

10

Father claims that, at age 10, Andrew may be found to be difficult to place for adoption. (§ 366.26, subd. (c)(3); *In re Michael G.* (2012) 203 Cal.App.4th 580, 591.) Where such a finding is made, termination of parental rights may be delayed for a maximum 180 days. (§ 366.26, subd. (c)(3).) But that finding is properly made only where there is no identified or available prospective adoptive parent "because of" the child's membership in a sibling group, diagnosed handicap, or age of seven years or more. (*Ibid; In re B.D.* (2008) 159 Cal.App.4th 1218, 1238.) In this case, the evidence suggested the lack of an identified parent was *because of* factors, including the "high risk" designation, that do not trigger application of the subdivision.

Father claims this case is similar to *In re B.D., supra,* 159 Cal.App.4th 1218, in that the children were almost ages seven and 11 and they had emotional problems including enuresis and molestation issues. But the social worker in *In re B.D.* testified that B.D. would "require a long therapeutic process before he would accept adoption." (*Id.* at p. 1232.) Here, in contrast, Andrew and father engaged in a therapeutic process regarding whether visits would continue or not and, in father's words, Andrew "handled it pretty well. He's actually really mature for his age." Father's appellate speculation that Andrew would experience a "meltdown" when he learns he cannot return to father's home finds scant support in the record.

In sum, the juvenile court's finding that the children are adoptable is supported by evidence that is reasonable, credible, and of solid value. (*In re Angelia P., supra*, 28 Cal.3d at p. 924; *In re Jason L., supra*, 222 Cal.App.3d at p. 1214.)

DISPOSITION

As to each child, the order terminating parental rights is affirmed.


       HULL       , J.


We concur:


       BLEASE       , Acting P. J.


       NICHOLSON       , J.